No. 24-2179

———————————————————————————

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

———————————————————————————

MARY ANN ARNOLD,
Plaintiff-Appellant

v.

UNITED AIRLINES, INC.,
Defendant-Appellee.

———————————————————————————

On Appeal from the United States District Court
for the Northern District of Illinois
Case No. 1:22-cv-00405
The Honorable Judge Charles P. Kocoras

———————————————————————————

**PLAINTIFF-APPELLANT MARY ANN ARNOLD'S OPENING BRIEF AND
REQUIRED SHORT APPENDIX**

———————————————————————————

Danielle Hamilton
Kana Turley*
Jacob Allen*
Anirudh Koka*
Northwestern University Pritzker School of Law
Federal Appellate Practice Clinic
Carter G. Phillips Center for Supreme Court & Appellate Advocacy
375 E. Chicago Avenue, 8th Floor Chicago, IL 60611
(312) 503-1486
danielle.hamilton@law.northwestern.edu
* Law student appearing on brief pursuant to Supreme Court Rule 711

*Attorneys for Plaintiff-Appellant*

**ORAL ARGUMENT REQUESTED**

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-2179

Short Caption: Mary Arnold v. UAL

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Mary Ann Arnold

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Goldman & Ehrlich; Ogletree Deakins Nash Smoak & Stewart; Northwestern Pritzker School of Law

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and
N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
N/A

---

Attorney's Signature: /s/ Danielle Hamilton                    Date: 12/09/2024

Attorney's Printed Name: Danielle Hamilton

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     Yes ✔   No ☐

Address: Northwestern Pritzker School of Law

375 E. Chicago Avenue Chicago, IL 60611

Phone Number: 312.503.1486                    Fax Number: 312.503.8977

E-Mail Address: danielle.hamilton@law.northwestern.edu

rev. 12/19 AK

# TABLE OF CONTENTS

Introduction………………………………………………………...…………………….....1

Statement of Jurisdiction…………………………...………………………………....…....3

Statement of the Issues…..………………………………………………………….…..…4

Statement of the Case…………………………………………………………………….…5

    A.   Arnold receives several promotions and positive reviews for twenty-five years at United Airlines………………………………………………………….5

    B.   Arnold relocates to Chicago and reports a supervisor for sexual harassment……………………………………………………………….5

    C.   United transfers Arnold, reassigns her high-profile project to younger employees, and forces her to sit next to the supervisor she reported for sexual harassment………………………………………………..………………6

    D.   United declines to offer Arnold an exit package and instead decides to "focus on performance" …………………………………………………..…………8

    E.   United gives Arnold her first negative performance review in twenty-five years…………………………………………………………………...……9

    F.   United places Arnold on an onerous performance improvement plan that causes her to resign………………………………………………..………9

    G.   Arnold files suit, and the district court grants United's motion for summary judgment……………………………………………………………13

Summary of the Argument ………………………………………...……………….…....15

Argument………………………………………………………………………………….18

    I.   Summary judgment on Arnold's age discrimination claim was improper because the court failed to apply *Muldrow*…………………………………18

        A.   A reasonable jury could find that Arnold's job transfer constituted an adverse employment action………………….…..................................21

            1.   Arnold's job transfer satisfies the other elements of a prima facie case of age discrimination………………………………………22

            2.   A reasonable jury could conclude that United's reasons for Arnold's job transfer were pretextual……………………………24

        B.   A reasonable jury could find that Arnold's placement on a performance improvement plan constituted an adverse employment action………………………………………………..………………24

1. Arnold's placement on a performance plan satisfies the remaining elements of a prima facie case of age discrimination............26

2. A reasonable jury could conclude that United's reason for putting Arnold on a performance plan was pretextual.........................27

II. Summary judgment on Arnold's retaliation claim was improper because she showed that United treated her adversely when she engaged in protected activities.................................................................…..........................29

A. Arnold's age and sex-discrimination-related activities are protected activities under the ADEA and IHRA………….……...……….....…..29

B. A reasonable jury could find that United retaliated against Arnold by giving her a negative review and placing her on a performance improvement plan.......................................................…………..........31

III. Summary judgment on Arnold's hostile work environment claim was improper because of her protected status and the harassment she faced…......................33

A. Arnold's status as a sexual harassment complainant is statutorily protected.......................................................................…..............34

B. A reasonable jury could find that United created a pervasively offensive work environment..........................................…….......….....…….......35

IV. Dismissal of Arnold's constructive discharge claim was improper because the claim was exhausted, and her termination was inevitable.........................37

A. This Court should consider Arnold's administrative exhaustion argument.............................................................................….....38

B. This Court can take judicial notice of Arnold's notice of constructive discharge to the relevant state agency....................................................39

C. Arnold was not required to amend her administrative complaint to exhaust her claim.......................................................................…..41

D. A reasonable jury could find that Arnold's termination by United was inevitable...............................................................................…..42

Conclusion..............................................................................…...44

Certificate of Compliance....................................……..................45

Certificate of Service.............................................…...................46

Required Short Appendix..................................................…...47

# TABLE OF AUTHORITIES

*Amcast Indus. Corp. v. Detrex Corp.*, 2 F.3d 746 (7th Cir. 1993)..........................37

*Atanus v. Perry*, 520 F.3d 662 (7th Cir. 2008)..............................................25, 37

*Baker v. Macon Res., Inc.*, 750 F.3d 674 (7th Cir. 2014).....................................19

*Benuzzi v. Bd. of Educ. of City of Chi.*, 647 F.3d 652 (7th Cir. 2011).....................31

*Bourgeois v. Watson*, 977 F.3d 620 (7th Cir. 2020).......................................38, 39

*Brown v. M & M/Mars*, 883 F.2d 505 (7th Cir. 1989)........................................18

*Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006) ..................................................................................................16, 29, 31

*Castro v. DeVry Univ., Inc.*, 786 F.3d 559 (7th Cir. 2015)...................................32

*Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673 (7th Cir. 2010)...........................38

*Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497 (7th Cir. 1994)............................41, 42

*Coleman v. Donahoe*, 667 F.3d 835 (7th Cir. 2012)..........................................32

*Craftwood II, Inc. v. Generac Power Sys., Inc.*, 63 F.4th 1121 (7th Cir. 2023).........18

*Dear v. Shinseki*, 578 F.3d 605 (7th Cir. 2009)..........................................41, 42

*Doe v. Oberweis Dairy,* 456 F.3d 704 (7th Cir. 2006).......................................30

*E.E.O.C. v. Univ. of Chicago Hosps.*, 276 F.3d 326 (7th Cir. 2002).............39, 42, 43

*Filar v. Bd. of Educ.*, 526 F.3d 1054 (7th Cir. 2008)....................................19, 23

*Fortier* v. *Ameritech Mobile Commc'ns, Inc.*, 161 F.3d 1106 (7th Cir. 1998)......22, 23

*Foskett v. Great Wolf Resorts, Inc.*, 518 F.3d 518 (7th Cir. 2008).........................18

*Franzoni v. Hartmarx Corp.*, 300 F.3d 767 (7th Cir. 2002)..................................19

*Gentry v. Export Packaging Co.*, 238 F.3d 842 (7th Cir. 2001)..............................36

*Giacoletto v. Amax Zinc Co.*, 954 F.2d 424 (7th Cir. 1992)..................................23

v

*Gracia v. SigmaTron Int'l*, Inc., 986 F.3d 1058 (7th Cir. 2021)............................29

*Hall v. Nalco Co.*, 534 F.3d 644 (7th Cir. 2008)..................................................18

*Hamilton v. Promise Healthcare*, 2023 WL 6635076 (5th Cir. Oct. 12, 2023)..........40

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993).................................................35

*Hickman v. Bd. of Educ. of Hinsdale Twp.*, 2023 WL 9050972 (N.D. Ill. Dec. 29, 2023)..................................................................................................................38

*Huber v. Fox Valley Park Dist.*, 2021 WL 1546425 (N.D. Ill. Apr. 20, 2021)..........43

*In the Matter of Lisse*, 905 F.3d 495 (7th Cir. 2018).....................................40, 41

*Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887 (7th Cir. 2018)...............18

*Johnson v. Nestlé*, 2024 WL 4333188 (N.D. Ill. Sept. 27, 2024)...........................20

*Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 717 (3d Cir. 1997)..................36

*Lauth v. Covance, Inc.*, 863 F.3d 708 (7th Cir. 2017)....................................16, 31

*Lesiv v. Illinois Cent. R.R. Co.*, 39 F.4th 903 (7th Cir. 2022)...............................29

*McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973)....................................18

*Mendenhall v. Mueller Streamline Co.*, 419 F.3d 686 (7th Cir. 2005)...................35

*Milczak v. Gen. Motors, LLC*, 102 F.4th 772 (6th Cir. 2024)............................. 20

*Miller v. Borden, Inc.*, 168 F.3d 308 (7th Cir. 1999)..........................................24

*Milligan-Grimstad v. Stanley*, 877 F.3d 705 (7th Cir. 2017)...............................33

*Moses v. U.S. Steel Corp.*, 2012 WL 1066769 (N.D. Ind. Mar. 28, 2012)...............40

**Muldrow v. City of St. Louis**, 601 U.S. 346 (2024)
.................................................4, 15, 18, 19, 20, 21, 22, 24, 25, 26, 28, 29

*O'Loghlin v. Cnty. of Orange*, 229 F.3d 871 (9th Cir. 2000)...............................41

*O'Neal v. City of Chicago*, 392 F.3d 909 (7th Cir. 2004)...............................15, 21

*Opoka v. I.N.S.*, 94 F.3d 392 (7th Cir. 1996)..................................................40, 41

*Rizzo v. Sheahan*, 266 F.3d 705 (7th Cir. 2001)....................................................30

*Russell v. Bd. of Trustees of Univ. of Illinois at Chicago*, 243 F.3d 336 (7th Cir. 2001)................................................................................................................29

*Smith v. Kendall*, 2024 WL 4442040 (5th Cir. Oct. 8, 2024)................................20

*Sturgill v. Schneider Elec.*, 2018 WL 1257441 (N.D. Ind. Mar. 12, 2018)..............40

*Swenson v. Bd. of Educ. of City of Chicago*, 2023 WL 4352104 (N.D. Ill. July 5, 2023) ..............................................................................................................25, 37

*Thomas v. JBS Green Bay, Inc.*, 2024 WL 4719251 (7th Cir. Nov. 8, 2024)........ ...20

*Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378 (7th Cir. 2016)...................30

## INTRODUCTION

Mary Ann Arnold worked for United Airlines (United) for over twenty-six years. She was a high-performing employee and an established expert in corporate communications. Toward the end of her tenure at United, Arnold reported her supervisor for sexual harassment and complained about a disadvantageous transfer that removed her from a high-profile project that was reassigned to younger employees and forced her to sit near the supervisor whom she had accused of sexual harassment. When she asked to move seats, United told her to consider her future at the company. When United Human Resources representatives and Arnold's supervisors reluctantly discussed Arnold by email—expressing a preference to discuss in person or by phone so as not to leave a paper trail—they inquired about her seniority date. Because they were concerned over the "message" an exit package would send, they decided instead to "focus on [her] performance."

Over the next few months, United did just what they agreed to. First, Arnold received her first-ever and only negative performance review. Then, she was put on a performance improvement plan, which would result in her termination if she failed to meet the deliverables outlined in the plan. The plan proved to be punitive—through the plan, United drastically increased Arnold's workload, imposed unrealistic deadlines, subjected her to intense scrutiny, and publicly disparaged her. Meanwhile, a younger employee on Arnold's team with the same supposed performance issues was not put on an improvement plan.

1

At the end of Arnold's time on the plan, United informed her that she had failed to meet expectations and that her future at the company would be discussed in a final meeting. The meeting was rescheduled multiple times, leading Arnold to believe she would be fired. Arnold ultimately resigned, noting her resignation was an "[i]nvoluntary retirement as my working conditions are [i]ntolerable."

In January 2022, Arnold sued United for age discrimination, retaliation, hostile work environment, and constructive discharge. The record below shows that Arnold established genuine issues of material fact for all four claims. Despite this, the district court granted summary judgment to United on the age discrimination, retaliation, and hostile work environment claims and dismissed her constructive discharge claim without prejudice. In doing so, the district court committed multiple errors that require reversal, including applying the incorrect legal standard, disregarding Arnold's protected status, and repeatedly resolving fact disputes in United's favor. Arnold's claims should be fully reinstated, and her case should proceed to trial.

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this action because it involves violations of the Age Discrimination and Employment Act (ADEA) under 29 U.S.C. § 621 and the Illinois Human Rights Act (IHRA) under 775 ILCS 5/7A-104. Plaintiff Mary Ann Arnold filed a complaint against her former employer, United Airlines, in the Circuit Court of Cook County on June 15, 2021. United removed the suit to the Northern District Court of Illinois on January 24, 2022. The district court had original federal question jurisdiction over ADEA claims pursuant to 28 U.S.C. § 1331. The district court also had jurisdiction over the IHRA state law claims pursuant to 28 U.S.C. § 1367(a).

This Court has jurisdiction over the present appeal. The district court granted United's motion for summary judgment on all claims on July 11, 2024, disposing of Arnold's federal and state discrimination, retaliation, and hostile work environment claims and dismissing Arnold's constructive discharge claim without prejudice. Arnold timely appealed. *See* Fed. R. App. P. 4(a)(1)(A). This Court has jurisdiction to review the district court's decision per 28 U.S.C. § 129.

## STATEMENT OF THE ISSUES

I.    Did the district court err in granting summary judgment on Arnold's age discrimination claim when it failed to apply *Muldrow*?

II.    Did the district court err in granting summary judgment on Arnold's retaliation claim where a reasonable jury could find that United retaliated against Arnold for engaging in statutorily protected activities?

III.    Did the district court err in granting summary judgment on Arnold's hostile environment claim where a reasonable jury could find that United treated Arnold offensively because she reported sexual harassment?

IV.    Did the district court err in dismissing Arnold's constructive discharge claim for failure to exhaust when she notified the relevant state agency that she had involuntarily retired, where her constructive discharge claim is reasonably related to her administrative complaint, and where a reasonable jury could find her termination was inevitable?

## STATEMENT OF THE CASE

### A. Arnold receives several promotions and positive reviews for twenty-five years at United Airlines.

Mary Ann Arnold was an employee at United Airlines for over twenty-six years. R.44-1 at 4, 30. She was hired as an airport sales agent in 1994, working in Texas and Ohio. R.1-1 at 3; R.44-1 at 4. In 2017, she was promoted and relocated to United's headquarters in Chicago. R.44-1 at 4. From 1994 to 2019, she was consistently praised by her managers for her strong leadership, communication, and work ethic and never received a negative performance review. R.1-1 at 7; R.47-15; R.52 at ¶22.

### B. Arnold relocates to Chicago and reports a supervisor for sexual harassment.

Upon moving to United's headquarters in Chicago, Arnold quickly established herself as a communications expert. R.1-1 at 8. She drafted project communications, airport employee policies, and other matters related to internal corporate communications. *Id.* at 7. In late 2018, she began working on Core4, a high-profile project designed to establish and communicate United's company values. R.44-1 at 78; R.44-2 at 14–15; R.44-5 at 2–3. She created communication plans, training modules, and branding for Core4. R.44-1 at 112, 132; R.44-2 at 15. She was praised by her business partners for her work on the project and consulted for her expertise. R.44-1 at 34, 124; R.46 at 15–16, 18, 31.

Earlier in 2018, Arnold went on a business trip with her supervisor, Stephen Jones, who she alleges sexually harassed her by asking her to come to his hotel room and referring to him and Arnold as "lovers." R.52 at ¶3; R.47-3 at 2. In July

2018, Arnold complained internally without giving her name. *Id.* at 3. After Arnold complained, Jones's harassing behavior escalated. R.1-1 at 8. In September 2018, Arnold complained publicly and requested a full investigation. *Id*; R.47-6; *see* R.52 at ¶¶1–7;. United chose not to review the hotel's security videos and ultimately declined to discipline Jones. R.47-6 at 6, 24–26; R.1-1 at 8.

Due to the investigation, Arnold was allowed to report to a different supervisor named Stephanie Millichap. R.44-1 at 8–9. Millichap administered Arnold's 2018 year-end and 2019 mid-year performance reviews as her new supervisor. *Id.* at 17, 98–121. However, Millichap admitted that Jones, whom she knew Arnold had reported for sexual harassment, had written most of the reviews. *Id.* at 17; R.52 at ¶21. Though the reviews contained some negative feedback, Millichap ultimately gave Arnold positive performance ratings. *Id.* at 18-19, 107, 120.

## C. United transfers Arnold, reassigns her high-profile project to younger employees, and forces her to sit next to the supervisor she reported for sexual harassment.

In September 2019, United transferred Arnold to another department and changed her title from Senior Staff Representative to Senior Writer. *Id.* at 170; R.44-2 at 7; R.44-5 at 1; R.47-10. United changed Arnold's role from a project-based role—where she was considered a subject matter expert—to a data-entry role. R.44-1 at 170. In contrast to her previous role, her new role resulted in "far less visibility and partner interaction." R.46 at 31; *see* R.44-1 at 34; R.47-7 at 8–9. Her workload also increased significantly, as she went from servicing communications to less than four thousand employees to fifty thousand employees. R.44-1 at 170.

United also removed Arnold from the high-profile Core4 project, which humiliated her and confused her business partners who had previously praised her work. R.44-1 at 34; R.1-1 at 9; R.46 at 31. At the time of her transfer, United and Arnold documented that Core4 project initiatives were ongoing; Arnold was still drafting Core4 training modules and guiding Core4 communications. R. 44-1 at 112, 124, 132. Arnold's new supervisor, Laura Patterson, then reassigned the project to two younger employees: A.C., whose role at United was ranked higher than Arnold's, and T.S., whose role was ranked lower. R.1-1 at 9; R.44-5 at 3; R.52 at ¶8.

As part of her transfer, Arnold was part of a small team that required her to work alongside Jones again despite her sexual harassment complaint against him. R.44-1 at 35, 79; R.52 at ¶6. Arnold asked to be assigned to a different communications team since she was uncomfortable around Jones. *Id.* at 79. Over Arnold's objections, Patterson instructed her to sit within five feet of Jones, an assignment Arnold found abusive, humiliating, and harmful to her productivity. *Id.* at 35, 79; R.47-14 at 3–4.

In October 2019, Arnold met with Genesis Tirado and Preet Michelson, United's Human Resources Department members, to discuss an alternative seating option. R.44-1 at 34–35, 79. During the meeting, Michelson asked Arnold about her seniority. *Id.* at 34–35, 79; R.1-1 at 9, 79. Just days later, Tirado and Michelson rejected Arnold's seating change request. R.44-1 at 35, 79. When Arnold asked what other recourse she had, Michelson told her that she could resign and that she

should consider whether she wanted to work at United long-term. *Id.* at 34–35, 79; R.52 at ¶16.

Arnold contacted United's deputy general counsel as a last resort to address the issues resulting from her transfer. R.44-1 at 78. In addition to discussing her seating assignment, Arnold complained about her removal from Core4, the project's reassignment to a younger employee, less favorable and menial work responsibilities, unreasonable deadlines, increased work volume, and extreme scrutiny from her supervisors. *Id.* at 76; R.47-7 at 8-9. Ultimately, Arnold was assigned a seat further away from Jones, though still on the same floor. R.44-1 at 13, 35, 76.

### D. United declines to offer Arnold an exit package and instead decides to "focus on performance."

After Arnold escalated her work issues to the deputy general counsel, Patterson, Tirado, and Michelson discussed Arnold. R.47-13 at 3; R.52 at ¶23. Tirado testified in her deposition that many of these discussions were held in person or on the phone to avoid creating a paper trail. R.52 at ¶25; R.44-4 at 40. Over email, Patterson wrote, "Are there options to offer her a package? Let's explore." R.47-13 at 3. Tirado expressed concern over the "message" they would be "sending by providing [Arnold] an 'option' to leave" and cautioned that it "may be better if we connected in person/over the phone." *Id.* at 2. Patterson then clarified that her suggestion to offer Arnold an exit package was "exploratory to understand options" and that "we should think outside the box here." *Id.* In response, Tirado wrote that

she was "somewhat intentionally being vague via email" and that it was "best if we chat in person or via phone." *Id.* at 1.

Two days later, Patterson emailed Tirado and Michelson that she'd granted Arnold's seating change request. Patterson also wrote: "We will focus on performance." R.47-13 at 1; R.52 at ¶23.

### E. United gives Arnold her first negative performance review in twenty-five years.

In the ensuing months of late 2019, Arnold's supervisors increasingly subjected her to criticism focused on trivialities, imposed unreasonable deadlines on her excessive workload, and denied her valuable professional opportunities. R.44-1 at 36, 76, 171; R.47-14 at 3. She was repeatedly criticized for not meeting these deadlines or following her supervisors' directives. R.44-1 at 76; R.47-14 at 3. Arnold was given no substantive feedback, coaching, or guidance between October 2019 and February 2020. R.44-1 at 36; R.46 at 12, 32; R.52 at ¶30.

In February 2020, Arnold received a 2019 year-end rating of "Partially Meets Expectations," her first negative performance review in her twenty-five years at United. R.1-1 at 7; R.44-1 at 131; R.47-15; R.52 at ¶22. A panel of Arnold's supervisors and HR relayed the review to Arnold, claiming that she missed deadlines, submitted work at the last minute, insufficiently adapted to change, and required reminders to complete tasks. R.44-1 at 19–20; R.52 at ¶26. This review shocked Arnold, as she had not been informed of or coached on these performance deficiencies before the review. R.44-1 at 36; R.46 at 12, 32.

### F. United places Arnold on an onerous performance improvement plan that causes her to resign.

Due to the negative year-end review, United placed Arnold on a performance improvement plan, or "PIP." R.44-1 at 20–21; R.44-3 at 7. A PIP was not mandatory under United's policies, given that Arnold had only received one negative performance review. R.44-3 at 7. United's justifications for imposing a PIP were confusing to Arnold—they faulted her for asking repetitive "proactive" questions and finishing her assignments too close to the deadline. R.44-1 at 135.

Arnold understood that if United determined she failed to correct the issues outlined in the PIP, she could be terminated. R.44-1 at 31, 60; R.52 at ¶31. She requested her supervisors issue a "Letter of Expectation" instead, which would outline expectations but did not entail possible termination. R.44-3 at 11; R.47-17 at 3; R.52 at ¶24. United rejected Arnold's request and placed her on the PIP. R.46 at 4; R.47-9 at 1; R.47-7 at 11; R.47-16 at 1; R.52 at ¶24.

The United PIP designed for Arnold required her to complete several additional tasks on top of her existing workload, making deadlines nearly impossible to meet under the unsustainable number of responsibilities. R.44-1 at 27, 31, 151; R.52 at ¶32. On top of this enhanced workload, Arnold's supervisors regularly corrected her in front of business partners and United leaders who previously approved and praised her work. R.44-1 at 38; R.52 at ¶35. Arnold's supervisors also blamed her for the meetings that business partners had rescheduled. R.44-1 at 26–27, 149; R.52 at ¶34. Even when Arnold completed tasks on time, she was told she would not have met the deadline without a reminder.

10

R.44-1 at 149. Arnold regularly cried at work and needed therapy. R.44-1 at 44; R.47-14 at 4.

Between 2019 and 2020, Arnold worked alongside J.P., a younger colleague. R.44-2 at 7. J.P. worked in the same department as Arnold and reported to the same supervisors. R.46 at 7–8. Their supervisor testified that J.P. "missed deadlines," acted "particularly annoyed" and "short with colleagues" over last-minute requests, failed to pay sufficient "attention to detail and direction" on highly sensitive assignments, and did not take proper "urgency/ownership around some of the day-to-day projects." R.44-3 at 6–7, 18; R.52 at ¶¶45–46. Despite J.P.'s performance deficiencies, United gave her a positive year-end review in 2019. R.44-3 at 7; R.52 at ¶47.

On April 29, 2020, Arnold emailed United Chief Human Resources Officer Kate Gebo and four others about her abusive treatment under the PIP. R.44-4 at 23; R.52 at ¶38. Arnold stated she believed United was using the plan to force her out of the company due to her age and internal and external complaints. On May 5, after a cursory investigation, HR told Arnold they "reviewed all documentation" and spoke "to all the appropriate stakeholders" but did not find the negative review and placement on the PIP unjust. R.47-8 at 1; R.52 at ¶38. Remarkably, Arnold's direct supervisor, Schall, testified that she did not speak with HR during this investigation. R.44-3 at 9; R.52 at ¶39.

United set May 8, 2020, as the final day of Arnold's PIP. R.44-3 at 15. Arnold was scheduled to have a final meeting after that date to discuss her plan

deliverables and professional future at the company. *Id.* On May 15, Schall told Arnold that she had failed to meet her deliverables under the PIP, which would be discussed at the final meeting. R.47-24 at 1; R.52 at ¶33. Arnold believed she would be fired at this final meeting. R. 44-1 at 31. Her supervisors rescheduled this meeting three times, prolonging Arnold's agony over potentially losing her job. *Id.* at 27; R.44-3 at 15; R.52 at ¶37.

Ultimately, United's performance plan and the associated scrutiny, criticism, and adverse treatment, along with the repeated rescheduling of a meeting in which Arnold believed she would be fired, caused Arnold to resign on May 20, 2020. R.44-1 at 154–55; R.52 at ¶40. Tirado emailed congratulations to Arnold, to which Arnold responded that her retirement was an involuntary result of United's use of unfounded performance criticism to discriminate against her based on age and retaliate against her for her past complaints about age and sex discrimination. *Id.* at 154.

On March 2, 2020, Arnold filed a complaint with the Illinois Department of Human Rights (IDHR) and the Equal Employment Opportunity Commission (EEOC). *Id.* at 169. She alleged that United discriminated against her because of her age, *id.* at 173–74, retaliated against her for making age discrimination and sexual harassment complaints, *id.* at 174, and created a hostile work environment because she had complained of age discrimination and sexual harassment. *Id.* at 172. In July 2020, she alerted the IDHR in a complainant questionnaire that she had involuntarily retired due to United's retaliation, discrimination, and

harassment. S.A.00037–38. On March 19, 2021, IDHR issued a Notice of Dismissal

for Lack of Evidence. The agency dismissed Arnold's discrimination, retaliation, and

hostile work environment charges and granted her the right to sue. S.A.00033. In

this notice, the IDHR acknowledged that Arnold had retired after being harassed

and being placed on a PIP, which she alleged was designed to terminate her.

S.A.00034–35.

### G. Arnold files suit and the district court grants United's motion for summary judgment.

On June 15, 2021, Arnold sued United in the Circuit Court of Cook County,

Illinois. R.1-1 at 2. On December 9, 2021, she filed an amended complaint. *Id.* at 6.

United then removed the case to the U.S. Northern District Court of Illinois. R.1 at

1–4.

Arnold's federal lawsuit had claims for age discrimination, retaliation, hostile

work environment, and constructive discharge. R.1-1 at 10–12. United filed for

summary judgment on all claims, and the district court granted the motion in full.

S.A.00032.

The district court granted summary judgment on Arnold's age discrimination

claim because it found she had not alleged a materially adverse action against her.

S.A.00018. The court granted summary judgment on Arnold's retaliation claim,

finding that a reasonable jury could not find she had suffered a materially adverse

action or that those actions were causally connected to her engagement in a

statutorily protected activity. S.A.00023-–26. The court granted summary judgment

on the hostile work environment claim, finding that a reasonable jury could not find

that Arnold had suffered due to her membership in a protected group or that her work environment was sufficiently offensive. S.A.00027–28. Finally, the court dismissed Arnold's constructive discharge claim without prejudice because a) the claim was not administratively exhausted, and Arnold had waived the issue by failing to respond to it in response to United's summary judgment motion, and b) a reasonable jury could not find that her termination was inevitable. S.A.00028-31.

## SUMMARY OF THE ARGUMENT

This Court should reverse and reinstate all Arnold's claims for age discrimination, retaliation, hostile work environment, and constructive discharge for the following reasons.

*First*, the district court erred in granting summary judgment on Arnold's age discrimination claim because it failed to apply *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024), which was decided after the parties concluded briefing and before the district court issued its summary-judgment order. *In a Title VII analysis, Muldrow* significantly broadens what constitutes an adverse employment action. Previously, Title VII plaintiffs had to show they suffered "materially adverse" harm to prove the employer's action was adverse. *See, e.g.*, *O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004). After *Muldrow*, plaintiffs need only show they suffered "some harm" regarding a term or condition of their employment. 601 U.S. at 350, 354–355. Applying *Muldrow*, a reasonable jury could conclude that United acted adversely when it transferred Arnold to a role with less visibility and partner interaction and when it placed Arnold on a punitive performance plan designed to push her out of the company through heightened workplace scrutiny, public humiliation, and unfair deadlines.

*Second*, the district court committed two legal errors when it granted summary judgment on Arnold's retaliation claim. Its first error was dismissing many of Arnold's protected activities as irrelevant to her retaliation claim because they were related to sex—not age—discrimination. However, Arnold brought her

retaliation claim under both the Discrimination in Employment Act (ADEA) and the Illinois Human Rights Act (IHRA), the latter allowing discrimination based on sex and age discrimination. Consequently, the district court erred when it dismissed the claim without either evaluating Arnold's protected activities related to sex discrimination pursuant to her IHRA retaliation claim or relinquishing supplemental jurisdiction over her state law retaliation claim.

The district court's second error was finding that Arnold's negative performance review and performance improvement plan did not constitute adverse employment actions in retaliation claims. On the contrary, the Seventh Circuit has held negative performance reviews and performance improvement plans can constitute adverse employment actions where, as here, they are accompanied by tangible changes to the plaintiff's working conditions. *See, e.g., Lauth v. Covance, Inc.*, 863 F.3d 708, 717 (7th Cir. 2017). Applying the fact-intensive inquiry required by *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006), there is at the very least a genuine issue of material fact as to whether Arnold suffered an adverse action.

*Third*, the district court committed two errors in granting summary judgment on Arnold's hostile work environment claim. First, it incorrectly concluded that Arnold's sexual harassment complaint was irrelevant to her hostile work environment claim. As explained above, the IHRA authorizes hostile work environment claims based on age and sex. Second, when properly accounting for Arnold's sexual harassment complaint and the subsequent negative treatment she

received, a reasonable jury could conclude that Arnold faced a hostile work environment.

*Finally*, the district court should not have dismissed Arnold's constructive discharge claim. Although the district court found Arnold had waived the argument that the claim was administratively exhausted, this Court should still consider the issue on its merits due to the substantial rights involved. This Court can and should take judicial notice of documents submitted to the relevant stage agency, which shows that the claim was administratively exhausted. In addition, considering Arnold's evidence that United forced her to resign, a reasonable jury could conclude that Arnold was constructively discharged.

## ARGUMENT

This Court reviews a district court's order granting summary judgment de novo. *Hall v. Nalco Co.*, 534 F.3d 644, 646 (7th Cir. 2008). The Court construes all facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Foskett v. Great Wolf Resorts, Inc.*, 518 F.3d 518, 522 (7th Cir. 2008). Summary judgment is only granted when the moving party has demonstrated that there are no material issues of fact entitling the party to judgment as a matter of law. *Craftwood II, Inc. v. Generac Power Sys., Inc.*, 63 F.4th 1121, 1126 (7th Cir. 2023). Summary judgment is inappropriate if a reasonable jury could find for the nonmoving party. *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018).

### I. Summary judgment on Arnold's age discrimination claim was improper because the court failed to apply *Muldrow*.

The Age Discrimination in Employment Act (ADEA) makes it unlawful "for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual . . . because of such individual's age." 29 U.S.C. § 623(a). In an age discrimination case, a plaintiff "must prove that age was a determining factor in, or, in other words, a 'but for' cause of an adverse employment decision." *Brown v. M & M/Mars*, 883 F.2d 505, 507 (7th Cir. 1989). The plaintiff can meet this burden through the burden-shifting framework from *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802 (1973). *U.S. E.E.O.C. v. Century Broad. Corp.*, 957 F.2d 1446, 1450 (7th Cir. 1992). Under this framework, a plaintiff must establish a prima facie case of age discrimination by showing that they: (1) were in

the class of people protected by the ADEA (people over forty); (2) were meeting their employer's legitimate expectations; and (3) suffered an adverse employment action. *Id.* A plaintiff must also show that: (4) similarly situated, younger employees were treated more favorably. *Baker v. Macon Res., Inc.*, 750 F.3d 674, 676 (7th Cir. 2014). The similarly situated employee does not need to be a "doppelganger," but should "still be similar enough to eliminate confounding variables, such as differing roles, performance histories, or decision-making personnel." *Filar v. Bd. of Educ.*, 526 F.3d 1054, 1061 (7th Cir. 2008).

　　Recently, the Supreme Court changed the law under the third adverse action prong of the prima facie case of age discrimination. In *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024), a female police officer brought a Title VII suit against the St. Louis Police Department, alleging that she was transferred from a prestigious investigative role to a mundane administrative role because of her sex. *Id.* at 350–52. On appeal, the Eighth Circuit held that, under Title VII, the officer had to show that her job transfer caused her a "materially significant disadvantage." *Id.* at 352–53. The Eighth Circuit concluded that the detrimental effects of the officer's transfer were not significant enough. *Muldrow v. City of St. Louis Missouri*, 30 F.4th 680, 688–89 (8th Cir. 2022) (finding that the officer's transfer "did not result in a diminution to her title, salary, or benefits," but instead produced "only minor changes in [her] working conditions"). This approach was consonant with that taken in several other courts of appeal, including the Seventh Circuit. *See Muldrow*, 601 U.S. at 353 n.1 (referencing the Seventh Circuit's "materially adverse" standard).

The Supreme Court overturned the Eighth Circuit's decision, holding that a Title VII plaintiff need only show that an employment action caused "some harm" regarding a term or condition of employment rather than any other heightened standard for harm. *Muldrow*, 601 U.S. at 354–355. The Court explained that the phrase "discriminate against" in Title VII means to "treat[ ] a person worse" because of a protected characteristic. *Id. at* 354. Consequently, to require a heightened standard for harm "is to add words" to Title VII, the text of which does not distinguish between "significant" harms and "not-so-significant" harms. *Id.* at 355.

Because the Supreme Court's decision is grounded in the text of Title VII, courts have extended *Muldrow* to ADEA claims. *See, e.g., Smith v. Kendall*, 2024 WL 4442040, at *6 (5th Cir. Oct. 8, 2024) ("*Muldrow*, though decided in the Title VII context, appl[ies] equally to ADEA discrimination claims."); *Milczak* v. *Gen. Motors, LLC*, 102 F.4th 772, 787 (6th Cir. 2024) ("Because we rely on Title VII case law in the ADEA context, we apply [the *Muldrow*] standard here."). Courts have similarly extended the *Muldrow* decision beyond job transfers to other employment actions. *See, e.g., Thomas v. JBS Green Bay, Inc.*, 2024 WL 4719251, at *1 (7th Cir. Nov. 8, 2024) (finding that, after *Muldrow*, employment actions like delayed workplace training, denied requests for vacation time, and shift changes could be "sufficiently serious to be cognizable under Title VII"); *Johnson v. Nestlé*, 2024 WL 4333188, at *5 (N.D. Ill. Sept. 27, 2024) ("[T]here is no reason to limit the reasoning of *Muldrow*

to position transfers given the Supreme Court's reliance on the general statutory text.").

Before *Muldrow*, the Seventh Circuit required a Title VII plaintiff to show that the adverse employment action was "materially adverse." *See, e.g., O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004); *see also Muldrow*, 601 U.S. at 353 n.1 (citing *O'Neal* as an example of an artificially high standard for adverse employment actions). Now, under *Muldrow*'s lowered bar, a plaintiff in the Seventh Circuit need only show that the adverse employment action left them "worse off" regarding a term of condition of their employment. 601 U.S. at 359.

The district court granted summary judgment for United nearly two months after *Muldrow* was published. Nevertheless, the district court applied the Seventh Circuit's pre-*Muldrow* "materially adverse" standard to Arnold's case. S.A.00018. Under this artificially high standard, the district court dismissed Arnold's transfer as "a mere inconvenience or an alteration of job responsibilities" that did not amount to material adversity. *Id.* This heightened standard produced the very result condemned by *Muldrow*: that Arnold's discrimination claim was "rejected solely because [the] court[ ] rewrote Title VII." *Muldrow*, 601 U.S. at 356, 359.

## A. A reasonable jury could find that Arnold's job transfer constituted an adverse employment action.

Arnold's evidence raises a genuine dispute about whether her transfer left her "worse off" in several ways. *Muldrow*, 601 U.S. at 359. First, like the officer's transfer in *Muldrow*, Arnold's transfer did not affect her salary or benefits; however, it forced her into a role with "far less visibility and partner interaction" and a

dramatic increase in workload. R.46 at 31; *see* R.44-1 at 34, 170; *Muldrow*, 601 U.S. at 352–53. Second, Arnold was removed from Core4 despite her extensive contributions to the project, which she found "humiliating" and "confusing" to her teammates and business partners. R. 44-1 at 34; *see* R.1-1 at 9; R.46 at 31. Third, the transfer forced Arnold to work with and sit close to her former supervisor, whom she had reported for sexual harassment. R.44-1 at 13; R.47-14 at 3.

On this record, a reasonable jury could find that Arnold's transfer constitutes an adverse employment action under *Muldrow*.

### 1. Arnold's job transfer satisfies the other elements of a prima facie age discrimination case.

In addition to showing that Arnold suffered an adverse employment action under *Muldrow*, the record evidence also satisfies the other elements of Arnold's prima facie case of age discrimination. Specifically, Arnold has presented sufficient evidence that a reasonable jury could conclude that she was meeting United's legitimate employer expectations at the time of her transfer and that United treated younger employees more favorably.

First, Arnold's evidence creates a genuine dispute as to whether she met her employer's legitimate expectations at the time of her transfer. The district court should not have dismissed evidence of the quality of Arnold's performance before her transfer, S.A.00021–22, since the Seventh Circuit has long recognized that evidence of past performance is relevant to whether an employee was meeting their employer's expectations at the time of the adverse employment action. *Fortier v. Ameritech Mobile Commc'ns, Inc.*, 161 F.3d 1106, 1113 (7th Cir. 1998) ("[P]revious

employment history may be relevant and probative in assessing [an employee's] performance at the time of [their] termination."); *see also Giacoletto v. Amax Zinc Co.*, 954 F.2d 424, 426–27 (7th Cir. 1992) (finding that a jury was entitled to decide the question of pretext, in part, because the plaintiff's "performance evaluations in previous years" indicated that "he was an effective manager").

In this case, the record contains ample evidence that Arnold was meeting United's legitimate expectations at the time of her transfer. First, Arnold had only received positive performance ratings for years, including mere months before her transfer. R.44-1 at 98-121; *see generally* R.47-15. Arnold had been praised for her work in her prior role, and her colleagues were confused by her transfer. R.44-1 at 34. Additionally, the agreement between Arnold's supervisors and HR to "focus on performance" suggests that there were ulterior motives behind Arnold's single negative performance review. R.47-13 at 1; *see supra* at 9–10. This evidence creates a genuine question of material fact as to whether Arnold was meeting her legitimate employment expectations at the time of her transfer.

Finally, as to the fourth prong of the prima facie discrimination case, United admitted they gave Arnold's high-profile Core4 project to two younger employees. R.44-5 at 3. These younger employees and Arnold, though not "doppelganger[s]," were "similar enough to eliminate confounding variables," as they were all in the same department working under the same supervisor. *Filar*, 526 F.3d at 1061; R.44-5 at 2–3; R.47-10. As a result, a reasonable jury could conclude that United gave

23

more favorable treatment to younger employees with responsibilities sufficiently "fungible" with Arnold's. *Miller v. Borden, Inc.*, 168 F.3d 308, 314 (7th Cir. 1999).

### 2. A reasonable jury could conclude that United's reasons for Arnold's job transfer were pretextual.

United claims that Arnold was removed from Core4 because lower-level employees could complete the project's remaining administrative tasks. R. 44-5 at 3. A reasonable jury could find this justification is not legitimate for two reasons. First, although Patterson claimed that the Core4 project was better suited for a lower-level employee, she gave the project to A.C., an employee at a level even higher than Arnold's. *Id.* This discrepancy creates a genuine issue of material fact over whether Patterson's justification for removing Arnold from the Core4 project was legitimate. Second, the record reflects that the Core4 project was not complete. United and Arnold documented contemporaneously at the time of her transfer that Core4 project initiatives were ongoing. R.44-1 at 112, 124, 132–33. The jury need not accept, and could well reject, United's reasons for transferring Arnold to a less desirable position and removing her from the high-profile project.

### B. A reasonable jury could find that Arnold's placement on a performance improvement plan constituted an adverse employment action.

As discussed above, *Muldrow* rejected any heightened standard for adverse employment actions, requiring only that the plaintiff show "some harm" to a term or condition of their employment. *See supra* at 20–22. Applying *Muldrow*, United placing Arnold on a performance improvement plan also constitutes an adverse action.

24

The record shows that Arnold was placed on a PIP that entailed several worsened conditions of employment. United gave Arnold additional tasks on top of the excessive workload of her regular responsibilities, which was exacerbated when her group shrunk to two writers. R.44-1 at 76, 151. This increased workload is like the unfavorable schedule and non-prestigious "beat patrol" suffered by the plaintiff in *Muldrow*. 601 U.S. at 351–52. Just as the *Muldrow* plaintiff lost networking opportunities with commanding officers, Arnold was admonished in front of multiple business partners. *Id.* at 352; R.44-1 at 38.

In addition, United's repeated rescheduling of Arnold's final plan meeting forced her to work under these difficult conditions while believing she would be fired. R.44-3 at 15. Finally, placement on the PIP injured Arnold's professional reputation and mental health. R.44-1 at 44; R.47-14 at 4.

In reaching the contrary conclusion, the district court relied on pre-*Muldrow* decisions that applied the now incorrect legal standard. *See, e.g.*, S.A.00018–19 (citing *Atanus v. Perry*, 520 F.3d 662, 678 (7th Cir. 2008) ("[a]n adverse employment action, nevertheless, is one that is materially adverse, meaning more than a mere inconvenience or an alteration of job responsibilities."); *Swenson v. Bd. of Educ. of City of Chicago*, 2023 WL 4352104, at *3 (N.D. Ill. July 5, 2023) (same)). Those cases are, in any event, distinguishable from Arnold's onerous performance improvement plan. For example, in *Atanus*, the performance plan required no additional work and no change to job responsibilities. 520 F.3d at 675. In *Swenson*, the performance warnings given to the plaintiff entailed no change in workload or

treatment. 2023 WL 4352104, at *4–5. These improvement plans were minimally onerous and bear little resemblance to the punitive plan designed by United.

Accordingly, the district court erred by applying cases with abrogated tests and very different facts. Under *Muldrow*, a jury could find that the performance plan constitutes an adverse action because it worsened Arnold's employment with its excessive workload, unrealistic deadlines, public criticism, reductive administrative tasks, and unnecessary prolonging of a decisive meeting regarding her future at the company.

### 1. Arnold's placement on a performance plan satisfies the remaining elements of a prima facie case of age discrimination.

In addition to Arnold showing that she suffered an adverse employment action when placed on the PIP*,* Arnold has demonstrated a prima facie case for age discrimination because she also showed that she performed in accord with United's legitimate expectations and similarly situated employees were treated more favorably.

First, Arnold presented enough evidence such that a reasonable jury could find she was meeting legitimate expectations when she was placed on the PIP. During this time, Arnold received praise from United leaders and outside business partners. R.44-1 at 38. On top of the contemporary evidence of praise, Arnold never received a negative performance review in over twenty-five years with United. R.52 at ¶22. As discussed above, past employment history can be probative in assessing an employee's performance during the adverse employment action. *See supra* at 23–24.

Second, Arnold submitted evidence that a younger employee was treated more favorably. J.P., a 44-year-old colleague of Arnold, reported to the same supervisors as Arnold and worked on similar assignments. R.46 at 7–8. Importantly, J.P. also exhibited the same performance issues that Arnold supposedly exhibited, including missing deadlines. S.A.00014. Yet J.P. was given a satisfactory performance review in 2019 and not placed on a performance plan. R.44-3 at 7.

The district court ignored this evidence when it concluded that Arnold failed to demonstrate that she was meeting legitimate expectations and was treated less favorably than a younger, similar coworker. Based on the evidence of praise for Arnold and J.P.'s favorable treatment, a reasonable jury could find that placement on the performance plan makes out a prima facie case of age discrimination.

### 2. A reasonable jury could conclude that United's reason for putting Arnold on a performance plan was pretextual.

United argued Arnold's work performance was its reason for placing Arnold on a performance plan—specifically that Arnold was missing deadlines, submitting work last minute, insufficiently adapting to change, and required repeated reminders to complete tasks. S.A.00020–21.

A reasonable jury could find United used Arnold's performance as illegitimate and pretextual. For one, United claimed Arnold had work performance issues *after* they decided to use her performance to push her out of the company. In early October 2019, the United human resources director asked Arnold about her seniority date and long-term plans with the company, demonstrating her focus on

Arnold's age before any reported performance issues. R.44-1 at 34–35, 79. United discussed offering Arnold a monetary package to leave the company. R.47-13 at 3. Two days later, United decided instead to "focus on her performance." *Id.* at 1. Between October 2019 and February 2020, United scrutinized and blamed Arnold while offering no coaching to correct these supposed problems. R.44-1 at 76; R.46 at 12, 29. A few months after complaining of age and sex discrimination associated with her transfer, United gave Arnold her first-ever negative review and placed her on a PIP. R.44-1 at 131, 159; R.46 at 29.

Second, United's actions between October 2019 and February 2020 show they were not legitimately concerned about her work performance. Had they been concerned, they would have provided coaching and support before the negative review. Instead, United imposed the PIP despite it not being mandatory and despite Arnold requesting the less severe Letter of Expectation. R.44-3 at 7. Upon administering the plan, Arnold's supervisors inundated her with tasks under unrealistic deadlines to ensure she would not complete the plan successfully. R.44-1 at 151. Even when Arnold completed tasks successfully and received praise from business partners, her supervisors publicly criticized her efforts and even claimed she only met the deadline because she was reminded. *Id.* at 38, 149.

In sum, applying *Muldrow*, a reasonable jury could conclude that either or both Arnold's transfer or her placement on a PIP constituted adverse employment actions. Accordingly, this Court should reinstate her age discrimination claim.

**II. Summary judgment on Arnold's retaliation claim was improper because she showed that United treated her adversely when she engaged in protected activities.**

Under the Title VII framework that extends to the ADEA and IHRA, a plaintiff can prove retaliation by showing that (1) they engaged in statutorily protected activity; (2) they suffered an adverse employment action; and (3) there is a causal link between their protected activity and the adverse employment action. *Russell v. Bd. of Trustees of Univ. of Illinois at Chicago*, 243 F.3d 336, 344 (7th Cir. 2001); *see also Gracia v. SigmaTron Int'l*, Inc., 986 F.3d 1058, 1062 (7th Cir. 2021) (Illinois courts apply the Title VII retaliation framework to the IHRA).

To meet the second prong, a plaintiff must show that the challenged employment action was "materially adverse." *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006); *Muldrow*, 601 U.S. at 357. Courts have interpreted this standard more leniently than those employed in pre-*Muldrow* discrimination cases. *See, e.g.*, *Lesiv v. Illinois Cent. R.R. Co.*, 39 F.4th 903, 912 (7th Cir. 2022) (describing the *Burlington Northern* standard as "easier to satisfy than the comparable [pre-*Muldrow*] standard for Title VII discrimination claims"). Accordingly, the adverse employment action inquiry is fact specific. *See Burlington*, 548 U.S. at 69 (describing how a schedule change, which would not significantly affect some workers, "may matter enormously to a young mother with school-age children").

**A. Arnold's age and sex-discrimination-related activities are protected activities under the ADEA and IHRA.**

Arnold provided six examples of protected activity relevant to her retaliation claim, R.45 at 9; S.A.00023-24. However, the district court found that only Arnold's one activity—a 2017 age and disability discrimination complaint—was relevant to her retaliation claim. S.A.00024.

This finding was incorrect for two reasons. First, unlike the ADEA, the IHRA allows for retaliation claims based on protected activities related to sex discrimination. 775 ILCS 5/1-102 (A), 5/6-101 (A)(i). Had the district court properly analyzed Arnold's retaliation claim under the IHRA, it would have considered the following protected activities related to sex discrimination: Arnold's sexual harassment complaint against her former supervisor, complaints about being forced to sit near that supervisor, and complaints being treated poorly after she escalated the seating issue to the deputy general counsel. *See Rizzo v. Sheahan*, 266 F.3d 705, 709–710, 715 (7th Cir. 2001) (finding that internal sexual harassment complaints were statutorily protected activity); *Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 382–383 (7th Cir. 2016) (finding that the IHRA protects against retaliation for sexual harassment complaints).

However, the district court did not consider Arnold's IHRA claim at all, nor did it decline to exercise supplemental jurisdiction over the claim, "as is routine," so that Arnold could have her day in court. *Doe v. Oberweis Dairy,* 456 F.3d 704, 708 (7th Cir. 2006) (describing the routine practice of relinquishing jurisdiction of the state law claims after dismissing the federal law claims); *see* 28 U.S.C. § 1367(c)(3).

Instead, it improperly granted summary judgment on the IHRA retaliation claim without considering its merits.

Second, the district court should have considered Arnold's complaints about her transfer. Arnold has previously established that her transfer constitutes a prima facie case of age discrimination. *See supra* at 22–25. Her complaints about her transfer and the accompanying harms were thus directly related to age discrimination and, therefore, protected activities relevant to her ADEA retaliation claim.

### B. A reasonable jury could find that United retaliated against Arnold by giving her a negative review and placing her on a performance improvement plan.

The second prong of the retaliation framework asks whether United acted adversely by giving Arnold a negative performance review and placing her on a PIP. The district court found that negative performance reviews and improvement plans are not adverse employment actions. S.A.00025. However, this proposition oversimplifies the Seventh Circuit's long-standing acknowledgment that negative performance reviews and performance plans may constitute an adverse employment action in retaliation cases if they result in a "quantitative or qualitative change in the terms or conditions of [the plaintiff's] employment." *Lauth*, 863 F.3d at 717; *see also Benuzzi v. Bd. of Educ. of City of Chi.*, 647 F.3d 652, 665 (7th Cir. 2011) ("[C]ontext is a crucial consideration in Title VII retaliation actions[.]"). Here, Arnold's first-ever negative performance review and placement on a punitive PIP tangibly impacted the terms and conditions of her employment: United drastically increased her workload, imposed unrealistic deadlines, and made her the target of

humiliating public correction. R.44-1 at 38, 76, 151. Thus, under the lenient, fact-intensive standard of *Burlington Northern*, a jury could reasonably infer that Arnold's negative performance reviews constituted adverse employment actions.

The third prong of the retaliation analysis—causation—may be established through circumstantial evidence of suspicious timing, different treatment toward similarly situated employees, and pretext. *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 564–565 (7th Cir. 2015). A reasonable jury could find a causal link between United's adverse actions and Arnold's relevant protected activities.

Regarding suspicious timing, the Seventh Circuit has recognized a timing of a few months as sufficient to "provide probative evidence of the required causal nexus." *Coleman v. Donahoe*, 667 F.3d 835, 861 (7th Cir. 2012). Here, Arnold complained about her seating arrangement in September 2019—which relates directly to her 2018 sexual harassment complaint—and the loss of the Core4 project to a younger employee in October 2019. R.44-1 at 76–78; R.47-7 at 8–9. Also, in October 2019, Arnold's supervisors and HR emailed about offering Arnold an exit package to encourage her departure from the company. R.47-13 at 2–3. After expressing concern over the "message" an exit package would send, they decided to "focus on [her] performance." *Id.* at 1–2. A mere two months later, at the beginning of 2020, United gave Arnold her first negative review and placed her on a PIP. R.44-1 at 20–22. A reasonable jury could find that the few months between Arnold's complaints and United's actions to push Arnold out is circumstantial evidence of retaliation. *Coleman*, 667 F.3d at 861.

In addition, the record evidence of a younger employee treated more favorably supports the inference of a causal connection between Arnold's complaints and United's adverse actions. Arnold and her younger coworker, J.P., were transferred from the same department, reported to the same supervisors, and worked on similar assignments. R.46 at 7–8. Their supervisor testified that J.P. missed deadlines, acted annoyed with colleagues, failed to pay due attention to detail, and did not take proper ownership and urgency over projects. R.44-3 at 6–7, 18. Despite exhibiting as many or more performance issues as Arnold, United gave J.P. a positive performance review and did not place her on a PIP. R.44-3 at 7.

Lastly, a reasonable jury could conclude that United's justification for Arnold's negative review and onerous improvement plan was pretextual. As described above, the communications between Arnold's supervisors and HR suggest that their "focus on [Arnold's] performance" was driven not by actual performance issues but by a desire to force her out of the company due to her complaints. *See generally* R.47-13; *see supra* at 33.

### III. Summary judgment on Arnold's hostile work environment claim was improper because of her protected status and the harassment she faced.

To prove a claim of hostile work environment, a plaintiff must show: (1) they are a member of a protected class, (2) the workplace was both subjectively and objectively offensive, (3) their employers' adverse actions were severe or pervasive, and (4) that there is a basis for employer liability. *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 713 (7th Cir. 2017). Here, the district court erred in granting summary judgment on this claim in United's favor for two reasons. First, the court

incorrectly found that Arnold did not allege a connection to a protected group even though she alleged she was retaliated against for complaining of sexual harassment. Second, it incorrectly found that the offenses Arnold suffered did not rise to the level of a hostile work environment.

### A. Arnold's status as a sexual harassment complainant is statutorily protected.

Arnold submitted the following evidence to support her hostile work environment: United forced her to work with and sit close to the supervisor she reported for sexual harassment, R.44-1 at 13, 79, and engaged in a concerted plan to push her out of the company by focusing on her performance. *Id.* at 135; R.47-13 at 1–2. The district court found that Arnold did not show that these harassing incidents were based on age discrimination or in retaliation for her age-based protected activities, S.A.00028, but, as explained above, complaints of sexual harassment are statutorily protected. *See supra* 29-30.

Considering Arnold's protected status as a sexual harassment complainant, a reasonable jury could find a genuine issue of material fact as to whether she faced pervasive harassment because of reporting sexual harassment. Arnold's evidence was as follows: After Arnold complained of sexual harassment, United intensely scrutinized, publicly humiliated, negatively evaluated, and placed her on an onerous PIP. R.44-1 at 38, 131–136, 149; R.47-3 at 1; R.47-26. In addition, even after Arnold had her supervisor for sexual harassment, that supervisor was permitted to contribute to two performance reviews. R. 44-1 at 17–18; R.47-6 at 1. United forced her to continue working with and sitting close to her supervisor even

after learning of her sexual harassment complaint. R.44-1 at 13, 79. United even told Arnold to consider her future at the company if she did not comply with sitting close to the supervisor she had reported. *Id.* at 34–35, 79.

Finally, the email exchange between Arnold's supervisor and HR, in which they decided to focus on Arnold's performance, is circumstantial evidence of the company's retaliatory intent. R.47-13 at 1. A few months later, United gave Arnold her first-ever negative performance review, which became the basis for putting her on an onerous PIP. R.44-1 at 122, 131–139, R.44-3 at 7. On this record, a reasonable jury could find that Arnold suffered adverse actions because she complained about sexual harassment.

### B. A reasonable jury could find that United created a pervasively offensive work environment.

To prove a hostile work environment, a plaintiff must also show they subjectively felt abused as well as enough severe or pervasive conduct for a reasonable person to find the work environment abusive. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). In considering whether a workplace is hostile, the Seventh Circuit assesses the "frequency of the discriminatory conduct," its threatening or humiliating nature, and whether the conduct unreasonably interfered with the employee's performance. *Mendenhall v. Mueller Streamline Co.*, 419 F.3d 686, 691 (7th Cir. 2005) (citation omitted). This Court has held that a jury's finding of a hostile work environment was reasonable where the harassment caused the plaintiff to find it hard to concentrate, cry often, and seek mental health treatment. *See Gentry v. Export Packaging Co.*, 238 F.3d 842, 851 (7th Cir. 2001). A

sister circuit has held that forcing an employee to work near a coworker they reported for harassment adds to the hostility of the workplace. *See Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 717 (3d Cir. 1997).

Here, the district court erred when it found that United's treatment did not rise to the level required to create a hostile work environment. The court ignored the fact that Arnold's supervisors forced her to sit near and work with the person she reported for sexual harassment, R.44-1 at 13, that she found her seating assignment abusive and humiliating, and that it interfered with her productivity. R.47-14 at 3–4. Under these circumstances, a reasonable jury could have found that Arnold's seating assignment added to the hostility of her workplace. *See Konstantopoulos*, 112 F.3d at 717.

The court also ignored evidence that United subjected Arnold to humiliating and highly punitive experiences when they put her on a PIP instead of providing coaching or enacting less severe forms of discipline, such as a letter of expectation. R.44-1 at 139; R.47-16. In addition, under the PIP, Arnold's supervisors escalated their intense micromanagement of her, imposed additional unrealistic deadlines, inundated her with even more work, and admonished her in public, R.44-1 at 38, 76, 151. United's performance plan differed substantially from other plans found not materially adverse: it added onerous tasks and unreasonable deadlines to Arnold's already impossible workload. United's performance plan differed markedly from other plans found not materially adverse: it added onerous tasks and unreasonable deadlines to Arnold's already impossible workload. R.44-1 at 151; *Atanus*, 520 F.3d

662, at 675; *Swenson*, 2023 WL 4352104, at *4–5. Even when Arnold completed tasks on time, United still belittled her. R.44-1 at 151. Arnold needed therapy due to United's abusive treatment of her, and she regularly cried at work. R.44-1 at 44; R.47-14 at 4.

Considering the frequency, severity, and humiliating nature of the hostile acts Arnold faced, as well as their interference with her work performance, a reasonable jury could have found that Arnold objectively and subjectively faced a pervasive and offensive workplace. It was error for the district court to grant summary judgment on this claim.

## IV. Dismissal of Arnold's constructive discharge claim was improper because the claim was exhausted, and her termination was inevitable.

This Court should reverse the district court's decision to dismiss Arnold's constructive discharge claim without prejudice. While the district court held that Arnold waived the argument that her claim was administratively exhausted, this Court has the discretion to consider this argument in the interest of justice. *Amcast Indus. Corp. v. Detrex Corp.*, 2 F.3d 746, 749 (7th Cir. 1993) (finding that where failure to present a ground caused no harm, the court should exercise lenity and resolve the issue).

To administratively exhaust a claim of constructive discharge, a plaintiff must file a charge of discrimination with the Illinois Department of Human Rights (IDHR) before initiating a suit under the Illinois Human Rights Act (IHRA). *Hickman v. Bd. of Educ. of Hinsdale Twp.*, 2023 WL 9050972 *3 (N.D. Ill. Dec. 29, 2023) (citing 775 ILCS 5/7A-102(D), (G)). Further, to succeed on a constructive

discharge claim, a plaintiff must show that a reasonable employee would have found their working conditions unbearable. *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010). A plaintiff can prove unbearable working conditions by showing that their termination was inevitable. *Id.*

### A. This Court should consider Arnold's administrative exhaustion argument.

The district court held that Arnold waived the argument that her constructive discharge claim was administratively exhausted because she failed to respond to this issue at the summary judgment stage. S.A.00028. However, this Court has held that when a party fails to raise a timely argument out of oversight, the Court may consider the argument if the party can show that it involves substantial rights, exceptional circumstances, and a miscarriage of justice. *Bourgeois v. Watson*, 977 F.3d 620, 629 (7th Cir. 2020). This Court has the discretion to consider whether the circumstances here meet these criteria. *Id.* at 629–630.

The Court should exercise its discretion to consider these issues for a few reasons. First, counsel for Arnold inadvertently failed to respond to United's argument that her claim was not exhausted. Her lack of response only disadvantaged her, as the district court dismissed her claim because of her inaction. S.A.00028. Not resolving this issue on the merits would suggest Arnold intentionally relinquished her right to argue that her constructive discharge claim was exhausted, which would be against the interests of justice. *Bourgeois*, 977 F.3d at 629.

38

Next, substantial rights hinge on this issue. Arnold alleged that United's actions caused her to be constructively discharged. R.1-1 at 3. The Seventh Circuit has held that a constructive discharge is a materially adverse employment action that occurs when an employer makes a work environment unbearable for an employee. *E.E.O.C. v. Univ. of Chicago Hosps.*, 276 F.3d 326, 331 (7th Cir. 2002). If Arnold is not allowed to address the administrative exhaustion issue, she will have no recourse to remedy the infringement of her substantial right to work.

This argument also involves exceptional circumstances, such that a miscarriage of justice would occur if it were not considered. As discussed below, Arnold administratively exhausted her constructive discharge claim. *See* S.A.00034 (IDHR Notice of Dismissal notes that Arnold involuntarily retired). It would be a miscarriage of justice for Arnold to be denied her right to remedy her constructive discharge from United because she did not notify the IDHR that she had retired when she had done so. S.A.00029; S.A.00034. Because of these exceptional circumstances, this Court should consider Arnold's administrative exhaustion argument.

### B. This Court can take judicial notice of Arnold's notice of constructive discharge to the relevant state agency.

This Court can take judicial notice of facts under Rule 201(b) of the Federal Rules of Evidence that can be accurately and quickly determined from reliable sources. *In the Matter of Lisse*, 905 F.3d at 496–497 (7th Cir. 2018). Further, this Court has an obligation to take judicial notice of relevant agency determinations. *Opoka v. I.N.S.*, 94 F.3d 392, 394 (7th Cir. 1996). District courts in this Circuit have

thus specifically taken judicial notice of administrative notices of dismissal and right-to-sue letters. *See, e.g.*, *Sturgill v. Schneider Elec.*, 2018 WL 1257441 at *2 (N.D. Ind. Mar. 12, 2018); *Moses v. U.S. Steel Corp.*, 2012 WL 1066769 at *1 (N.D. Ind. Mar. 28, 2012). In addition, a sister circuit has held that administrative questionnaires are subject to judicial notice. *Hamilton v. Promise Healthcare*, 2023 WL 6635076, *3 (5th Cir. Oct. 12, 2023).

This Court should take judicial notice of Arnold's notice to the IDHR that she was constructively discharged. Specifically, the IDHR's Notice of Dismissal and complainant questionnaire referenced in the notice, documents which were produced in discovery, reflect the IDHR's determination granting Arnold the right to sue. *See* S.A.00034–38. The notice acknowledges that Arnold alleged she retired after being harassed and facing a PIP plan she claimed was designed to terminate her. S.A.00034–35. In the complainant questionnaire stamped by the agency, S.A.00037, Arnold alerted IDHR that she had "involuntarily retired" due to United's retaliatory actions. S.A.00037–38.

This Court can and should take judicial notice of the adjudicative facts that (1) the IDHR acknowledged that Arnold retired after feeling retaliated against and that (2) Arnold informed the IDHR she had involuntarily retired. First, the accuracy of these facts can be easily verified through unquestionably reliable sources. *Lisse*, 905 F.3d at 496–497 (7th Cir. 2018). There can be no dispute that the notice reflects IDHR's findings from its investigation into Arnold's complaint and that the questionnaire discloses what Arnold communicated to the agency. Further, the

IDHR's acknowledgment that Arnold retired is part of a relevant agency determination that this Court has an obligation to take judicial notice of. *Opoka*, 94 F.3d 392, 394 (7th Cir. 1996). Therefore, this Court can and should take judicial notice of both facts.

### C. Arnold was not required to amend her administrative complaint to exhaust her claim.

The district court also gave as its basis for dismissal of Arnold's constructive discharge claim because she did not amend her administrative complaint with the IDHR. S.A.00029. This was incorrect because, under this Court's precedent, a claim in a lawsuit is exhausted when the administrative complaint describes the same conduct and implicates the same individuals as in the other charges in the complaint. *See Dear v. Shinseki*, 578 F.3d 605, 609 (7th Cir. 2009) (holding that the plaintiff's hostile work environment claim had been administratively exhausted through their discrimination and retaliation EEOC complaints). Further, a claim in a lawsuit is exhausted if it is reasonably related to the charges in an administrative complaint and if that claim can be expected to be discovered by an agency investigation into the matter. *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994). Other circuits have specified that this includes reasonably related new acts that occurred during agency review of the matter. *See, e.g.*, *O'Loghlin v. Cnty. of Orange*, 229 F.3d 871, 876 (9th Cir. 2000).

Here, Arnold's constructive discharge suit is within the scope of the administrative complaint she filed with the IDHR, alleging age discrimination, retaliation, and a hostile work environment. R.44-1 at 169-175. The amended

complaint asserted that she was "constructively discharged after having repeatedly suffered from harassment, hostile work environment, retaliation, age discrimination, and sexual harassment." R.1-1 at 10. The same adverse actions by the same supervisors she alleged in her age discrimination, retaliation, and hostile work environment claims form the basis of her constructive discharge claim. R.1-1 at 9–12; R.44-1 at 169-75. In addition, the IDHR discovered Arnold's constructive discharge while investigating the charges she listed in her administrative complaint. S.A.00034–35, S.A.00037–38. Accordingly, *Dear* and *Cheek* dictate that Arnold administratively exhausted her constructive discharge claim when she filed her related claims with the IDHR and notified the agency that she had involuntarily resigned due to United's actions. *Cheek*, 31 F.3d at 500; *Dear*, 578 F.3d at 609; S.A.00034–38.

### D. A reasonable jury could find that Arnold's termination by United was inevitable.

An employer's conduct amounts to constructive discharge when it acts in a manner that communicates to any reasonable employee that they will be terminated. *Univ. of Chicago Hosps.*, 276 F.3d at 332. In addition, significant changes in an employee's evaluations, repeated accusations of failure to follow directives, and a generally hostile environment can demonstrate an environment where the employee could be reasonably sure they were about to be fired. *Id.* A district court in this Circuit found that a warning to an employee that their employment was in jeopardy and increased work responsibilities would cause a

reasonable employee to believe their termination was imminent. *See Huber v. Fox Valley Park Dist.*, 2021 WL 1546425, at *4 (N.D. Ill. Apr. 20, 2021).

Here, the district court erred in finding no material dispute of whether Arnold's termination by United was inevitable. While United argued that Arnold's firing was possible, R.53 at 15, a jury is free to, and should, reject that argument based on the evidence Arnold submitted at the summary-judgment stage. As in *Huber*, Arnold showed a significant reduction in her performance evaluation—from twenty-five years of positive reviews to a negative review for the first time in 2019. R.44-1 at 17. As in *Univ. of Chicago Hosps.*, United repeatedly accused Arnold of not following directives, scrutinized her, and admonished her publicly. R.47-14 at 3; R.47-24 at 1; R. 47-26; R.44-1 at 38, 77, 131; R.44-5 at 2. United forced Arnold to sit close to the person she accused of sexual harassment and, when she asked to move seats, gave her a thinly veiled threat to consider her future at the company. R.44-1 at 79. United's decision to "focus on [Arnold's] performance" to make her leave instead of offering her a package further demonstrates that her termination was inevitable. R.47-13 at 1–2.

Critically, United placed Arnold on a punitive PIP and informed her that failure to meet the terms of the PIP would lead to termination. R.44-1 at 76. Arnold's supervisor then told her she had failed and that her failure and future at United would be discussed at a final meeting. R.47-26; R.44-1 at 147. This evidence at least creates a dispute as to whether it was reasonable for Arnold to believe she would be fired imminently.

## CONCLUSION

For the foregoing reasons, this Court should reverse and reinstate Arnold's claims of age discrimination, retaliation, hostile work environment, and constructive discharge.

Respectfully submitted,

/s/ Danielle Hamilton

Danielle Hamilton
Kana Turley*
Jacob Allen*
Anirudh Koka*
Northwestern University Pritzker School of Law
Federal Appellate Practice Clinic
Carter G. Phillips Center for Supreme Court &
Appellate Advocacy
375 E. Chicago Avenue, 8th Floor Chicago, IL 60611
(312) 503-1486
danielle.hamilton@law.northwestern.edu
* Law student; appearing on brief pursuant to Supreme
Court Rule 711

*Attorneys for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE WITH
## FEDERAL RULE OF APPELLATE PROCEDURE 32(a)

1. This brief complies with the type volume limitation of FED. R. APP. P.

   32(a)(7)(B)(i) because this brief contains 10,629 words, excluding the parts of

   the brief exempted by FED. R. APP. P. 32(f).

2. This brief complies with the typeface requirements of FED. R. APP. P.

   32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because

   this brief has been prepared in a proportionally spaced typeface using

   Microsoft Word 2010 in 12-point Century Font.

DATED: December 9, 2024

Respectfully submitted,

/s/ Danielle Hamilton

Danielle Hamilton
Kana Turley*
Jacob Allen*
Anirudh Koka*
Northwestern University Pritzker School of Law
Federal Appellate Practice Clinic
Carter G. Phillips Center for Supreme Court &
Appellate Advocacy
375 E. Chicago Avenue, 8th Floor Chicago, IL 60611
(312) 503-1486
danielle.hamilton@law.northwestern.edu
* Law student; appearing on brief pursuant to Supreme
Court Rule 711

*Attorneys for Plaintiff-Appellant*

## CERTIFICATE OF SERVICE

I, Danielle Hamilton, an attorney, certify that, on December 9, 2024, a copy of Plaintiff-Appellant's opening brief and short record were filed electronically through the appellate CM/ECF system with the Clerk of the Court. I further certify that all parties required to be served have been served.

/s/ Danielle Hamilton

# REQUIRED SHORT APPENDIX

*Contents*

Memorandum Opinion and Order.......................................................S.A.00001–00032

Excerpts from Illinois Department of Human Rights Notice of Dismissal and

Complainant Questionnaire...............................................................S.A.00033–00038

## CERTIFICATE

Pursuant to Circuit Rule 30(d), I hereby certify that this short appendix

includes all the materials required by Circuit Rules 30(a) and (b).

Respectfully submitted,

/s/ Danielle Hamilton

Danielle Hamilton
Kana Turley*
Jacob Allen*
Anirudh Koka*
Northwestern University Pritzker School of Law
Federal Appellate Practice Clinic
Carter G. Phillips Center for Supreme Court &
Appellate Advocacy
375 E. Chicago Avenue, 8th Floor Chicago, IL 60611
(312) 503-1486
danielle.hamilton@law.northwestern.edu
* Law student; appearing on brief pursuant to Supreme
Court Rule 711

*Attorneys for Plaintiff-Appellant*

**TABLE OF CONTENTS TO THE APPENDIX**

Opinion; Document #57 filed June 11, 2024........................................S.A.00001-00032

Excerpts from Illinois Department of Human Rights Notice of Dismissal and

Complainant Questionnaire.................................................................S.A.00033-00038

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| MARY ANN ARNOLD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 22 C 405 |
| | ) | |
| UNITED AIRLINES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

Plaintiff Mary Ann Arnold brings this action against her former employer, Defendant United Airlines, Inc. ("United"), alleging unlawful discrimination and retaliation in violation of the Age Discrimination in Employment Act ("ADEA") and the Illinois Human Rights Act ("IHRA"). Before the Court is United's motion for summary judgment on all claims. For the following reasons, the motion is granted.

## BACKGROUND

In resolving United's motion for summary judgment, the Court views the evidence in the light most favorable to Arnold as the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The following facts are undisputed except where noted. Any asserted facts or factual disputes that were not supported by evidence or were immaterial or otherwise inadmissible have not been included.

Arnold was hired by United on or about March 14, 1994, and left the company on May 20, 2020.[1]  Prior to a reorganization of United's corporate communications functions in September 2019, Arnold was part of a communications group responsible for internal United communications relating to airport operations.

Arnold made multiple complaints while working for United.  The first was in 2017 for age discrimination and failure to promote based on disability.  Arnold filed this complaint internally with United, which stated it could not substantiate her claims, and with the Illinois Department of Human Rights, where she later withdrew the complaint.

The second complaint was in July 2018, against her then-supervisor Steven Jones, for sexual harassment.  Arnold first submitted the complaint anonymously, but later resubmitted it using her own name in late September 2018.  United investigated and was unable to substantiate Arnold's claims.[2]

Arnold received her mid-year performance review for the period from January 1, 2018, to June 30, 2018, from Jones.  Jones gave Arnold an overall rating of "on track with peers."  Arnold does not know whether her 2018 mid-year review was completed by Jones before or after she made her 2018 anonymous complaint against him.  She

---

[1] The parties dispute whether Arnold "voluntarily retired," "involuntarily retired," or was "constructively discharged."

[2] Importantly, Arnold's claims in this case are not about the events that lead to the complaints, they are about Arnold's belief that she was retaliated against for making the complaints.

also does not know whether her meeting with Jones about the mid-year review took place before or after her complaint.

In December 2018, Arnold was allowed to begin reporting to Stephanie Millichap as an accommodation in connection with her sexual harassment complaint against Jones. Millichap gave Arnold her 2018 year-end review, but because Arnold had then been reporting to her for less than a month, Millichap conferred with Jones on the evaluation and allegedly told Arnold that most of the notes came from Jones's mid-year review and his notes of her performance.

In her 2018 year-end performance review, Millichap gave Arnold an overall rating of "Achieves." Arnold does not know whether the "Achieves" rating was determined by Millichap or Jones or through collaboration between the two of them.

In her comments in Arnold's 2018 year-end review, Millichap wrote in part:

> Mary Ann I'd like to see you take [a] more assertive role and proactively build strategic comms plans that include channels, timing, messaging, context/background and measurement. The projects we work on can be very complex and ambiguous, but part of our role is to seek out information and create structure and understanding for our frontline. Don't wait for your stakeholders to give you what you think you need; take the information you have, put it in the context of what you know about your audience, and create content that helps connect the dots. You have a passion for making sure the frontline gets what they need to be effective in their jobs, but you need to be proactive in identifying and solving the problems so that our business partners can achieve that goal.

Dkt. # 46, ¶ 24.

Arnold believes her 2018 year-end review was retaliatory because it referenced Jones's mid-year review. Arnold further believes that if Millichap had some areas that

she thought Arnold could improve on or had some criticisms of her performance, this is because of retaliation because Arnold had engaged in protected activity by complaining of sexual harassment.

Millichap gave Arnold her 2019 mid-year review and rated her as "on track with peers." However, in the mid-year review, Millichap noted the following performance issues and areas for improvement:

> Over the next six months, Mary Ann should focus on how she builds plans, creates timelines, sticks to deadlines and communicates progress. This type of end-to-end project ownership and leadership takes practice but is such a critical skill to be successful on the communications team and in the organization as a whole. More specifically proactively seeking information and answers, creating structure, setting deadlines and following up with your partners in order to get things done.

Dkt. # 46, ¶ 27. Millichap further wrote: "An additional area of focus is to develop your presentation skills and executive presence. This goes hand-in-hand with successful updates to key stakeholders and leaders." *Id.*

Arnold believes that if her manager had some constructive criticism, recommendations on how to do things better, or was critical of her performance, this was retaliatory because Arnold had engaged in protected activity.

Effective September 3, 2019, United reorganized its corporate communications functions and moved them under the umbrella of its Corporate Communications department. As part of that reorganization, Arnold and her entire team, as well as other communications employees, were moved under Corporate Communications.

Arnold and a co-worker[3] from her prior team (the "Coworker") began reporting to Courtney Schall, who reported to Laura Patterson, Director of Operations Communications. Following the reorganization and for the remainder of her employment at United, Arnold's position was Senior Writer in the Corporate Communications department. Compared to her previous role in communications in Airport Operations, some of Arnold's roles and responsibilities changed but the basic functions of those positions were the same in that they both dealt with internal corporate communications.

In a meeting before she officially started reporting to Schall, Arnold told Schall about her 2018 sexual harassment complaint against Jones, which Schall had not been previously aware of.  Schall is unaware of Arnold's 2017 age discrimination complaint.

Arnold testified that as part of the reorganization, a "major project" known as the "Core4 project" was taken away from her and given to a younger employee, whose age and level of experience are unknown.  United denies this was a "major project" and, according to Patterson, the project was essentially complete at the time of the reorganization.  Patterson stated that as part of the reorganization, a new team was created and charged with managing communications for large integrated campaigns and projects that spanned across many operations teams.  She added responsibility for any remaining Core4 tasks (along with multiple operations-wide projects that Arnold

---

[3] At all relevant times, both Arnold *and* the Coworker were over the age of 40.  The Coworker is less than seven years yournger than Arnold.  The Coworker was born in 1975 and Arnold was born in 1968.

was not a part of) to that team.  Patterson testified that at the time of the reassignment, she was unaware of and did not consider Arnold's age or the age of any of the new team members.

Arnold had specific conversations with both Schall and Patterson regarding her discomfort with Jones.  Schall was supportive; Patterson said she would do everything she could to keep the two apart but that she could not guarantee to keep the two apart as they "had a job to do."  Dkt. # 54, ¶ 13.

Following the reorganization, despite making her discomfort with Jones known to her supervisors, Arnold was directed to move floors, into a cubicle that she perceived to be "right near" Jones.  United denies Arnold was ever asked to sit "right near" Jones.  Arnold complained to Human Resources Manager Genesis Tirado about the seating arrangement and testified that in a phone call between herself and Tirado's boss, Preet Michelson, Michelson told her that she would need to sit with the team and also said that Arnold would need to decide if working here long term was going to work for her.  United denies the "working here" comment was made during this conversation.  Arnold escalated the issue to Garrison Phillips, a member of United's legal team.  Arnold testified that she "was able to get a better seating solution on the floor but outside the direct area" after she contacted Phillips.  Dkt. # 54, ¶ 15.

Arnold alleges that after switching teams due to the reorganization, the projects she was given had far less visibility and partner interaction, even though her business partners had all praised her work on the Core4 project and were confused when she

was taken off the project. Arnold also testified that she was given a lot more work despite reaching out to try and alleviate the pressure.

Tirado testified that in a meeting with Millichap prior to the reorganization, and before Arnold began reporting to Schall and Patterson, Millichap informed Tirado that she (Millichap) was having performance concerns with Arnold. Millichap told Tirado that she had pretty consistently coached Arnold on performance issues and was not seeing improvement. Arnold denies that she was given proper performance coaching.

After Arnold began reporting to Schall, Schall noticed the same performance issues that Millichap had observed, and Schall perceived these to be systemic performance issues, not one-off mistakes here and there that could be quickly rectified. However, Arnold testified that Schall gave very little feedback about her performance and the feedback she did receive was positive.

In an October 2019 email exchange between Patterson, Tirado, Michelson, and Patterson's supervisor Dana Reinglass, Patterson inquired about whether there were options to offer Arnold a package. Tirado replied, "What is the rationale for providing her a package? What message are we sending by providing her an option to leave (especially if she has not shared she wants to leave)." Dkt. # 47-13, at 2. Patterson clarified that her question was exploratory to understand available options. Ultimately, it was decided that they would "focus on performance." *Id.* at 1.

In an email about Arnold's seating situation, Tirado indicated that she was "somewhat intentionally being vague via email" because she wanted to make sure the

conversation took place over the phone.  Dkt. # 54, ¶ 25.  When asked whether this was in order to prevent there being a paper trail, Tirado responded, "I'd be speculating, but maybe." *Id.*

As of the end of 2019, it was Schall's assessment that Arnold's work performance was "subpar, at very best."  Dkt. # 46, ¶ 36.  At her deposition, Schall described why she referred to Arnold's performance as subpar as follows:

> Ability to meet deadlines. The amount of editing – you know, we're a group in corporate communications, a group of writers. The amount of editing that had to go into the content that she was generating. The amount of direction and redirection that she needed. The . . . amount of times that, you know, she would be assigned something and need to be reminded to get it done. All of this is reflected in the performance review and as far as what we were seeing in terms of the deficiencies versus what we would expect members of our team to be able to accomplish as functional members of a corporate communications organization.

*Id.* ¶ 39.

Near the end of 2019, Schall had a collaborative discussion with Patterson, Millichap, and Reinglass about Arnold's performance versus other similar individuals on the team at the same job level and what to do about Arnold's more pronounced level of deficiency and how to fix it.  The determination made collaboratively by Schall, Patterson, Millichap, and Reinglass was to list Arnold as partially meeting expectations and to put her on a Performance Improvement Plan ("PIP").  Prior to this review, Arnold had not received a rating below "Achieves" during her time at United (with the exception of the "on track with peers" ratings in her mid-year reviews).

In Arnold's 2019 year-end review, Schall wrote in part:

Mary Ann's areas for strengthening all fall within the Deliver Results dimension including the following competencies Accountability, Agility, and Execution. Mary Ann does not consistently demonstrate the ability to define expectations (deadlines in particular) and see those are met without much hardship. It seems difficult for Mary Ann to intake a project/change and clearly convey such a change to a broader group. Instances include PetSafe changes and proactive compensation changes, which have become problematic more broadly. Additionally, straightforward requests (like an editorial calendar/IntheNoc) often require numerous follow-ups over several months before work is executed. Despite deadlines with long runways and regular check-ins on progress to ensure Mary Ann is managing her assignments. [H]er work regularly comes together at the last minute. Even when final deadlines are met, this delayed output impacts (or is a burden to) her manager and peers during the review process. . . . Overall, during the Corp Comm re-organization, Mary Ann's ability to adjust, understand expectations and add value, was well behind her peers.

Dkt. # 46, ¶ 33. Arnold denies the truth of these comments and maintains that she consistently drove projects forward, including taking on new projects, and met deadlines as required by her job.

In February 2020, Arnold was issued a PIP. During her employment at United, Arnold was familiar with United's Working Together Guidelines ("WTGs") that contained the PIP policy, which states in part as follows:

Employees who do not meet performance expectations at either Mid-year or year-end will work with his/her leader to develop a plan that maps out a path to successful performance. The employee will be expected to meet the requirements outlined in the PIP within a specified time-frame. Employees who do not meet performance expectations will be subject to termination of employment. The above process will also apply to employees who partially meet expectation[s] at year-end two years in a row or at the discretion of the leader.

Dkt. # 46, ¶ 7.  Arnold knew that a rating of "partially meets" did not require or dictate a PIP, but she understood that the PIP process at United could be used at the discretion of her leader.

At her deposition, Schall explained that they made the decision to issue the PIP instead of some other corrective action because of the deficiencies they were seeing and Arnold's demonstrated need for a lot of structure and direction, and a PIP would be the best way to get Arnold to the place that she needed to be most effective.

The PIP described Arnold's performance deficiencies, plans for improving her performance, and consequences if performance expectations were not met during the 60-day PIP period.  The PIP stated in part: "Immediate and sustained improvement is expected to improve your current performance rating of 'partially meets expectations'; further disciplinary action up to and including termination could result. Failure to achieve expected behaviors and/or performance results will lead to disciplinary actions, up to and including termination."  Dkt. # 46, ¶ 41.

With respect to what her managers included in the PIP under performance deficiencies and behavioral/skill deficiencies, Arnold testified she could not recall whether those deficiencies were legitimate.  She personally believed, however, that her performance was way better than the way her managers were assessing it.

Arnold asked Patterson and Schall if she could get a "Letter of Expectation" instead of being put on a PIP.  This request was relayed to Tirado, Preet, and Reinglass. Schall and Patterson admitted to the others that they were unfamiliar with letters of

expectation and asked Tirado for more information about the process. Tirado recognized that there was some discretion to move forward with a letter of expectation instead of a PIP; however, Tirado concluded that, based on the recent performance issues Arnold had consistently been exhibiting, she was comfortable moving forward with the PIP.

Arnold maintains that Tirado put substantial pressure on her supervisors to issue a PIP instead of a letter of expectation. She reached out to Tirado and asked about the appeal process "for management around unfair performance rating and incorrect said rating on accelerated disciplinary and skipped levels." Dkt. # 54, ¶ 38. Tirado explained that each performance-related issue is handled on a case-by-case basis.

At no time after Arnold was issued the PIP was she subjected to any disciplinary actions such as demotion, salary reduction, or termination of her employment.[4]

During the PIP period, Schall and Patterson met periodically with Arnold to discuss her performance and how she was progressing with the PIP, and Schall continued to have one-on-one meetings with Arnold. Arnold continued to have performance deficiencies during the PIP period. For example, Schall and Patterson had a PIP progress check-in meeting with Arnold on April 23, 2020, and Schall sent an email later that day recapping the meeting. The recap of the PIP progress check-in included the following points:

---

[4] Arnold maintains that she was constructively discharged on May 20, 2020, when she retired.

(a) an incident in which Arnold submitted an assignment late in the day on February 24, 2020, with revisions still needed;

(b) certain March content was due on March 23rd or 24th, but Arnold did not provide it until 8:00 p.m. on March 29th, with significant edits still needed such that the final message went out very late on March 31st;

(c) a leader message that Arnold was requested to provide for a business partner in early April, with Schall noting that the process did not kick off until after a reminder from Schall to Arnold on April 14th to generate a draft message, with the final message being sent on April 17th, well beyond the agreed-upon early month deliveries for the business partner's message;

(d) An initial draft of another brief leader message was due by March 6, so that a draft could be sent for review by March 9th or 10th in advance of a targeted March 11th deployment date, where Arnold failed to provide the draft;

(e) Arnold submitted a distribution list resource document to Schall on-time on March 13th but there were still many holes to fill and adjustments to be made, and another member of the team had to take this on and saw it through to completion;

(f) Arnold had not submitted on-time delivery of Thursday updates beyond a single slide;

(g) Arnold had not by then identified any training opportunities to improve her presentation skills as requested;

(h) Arnold had by then started but not completed a requested project-tracker that was to be used to review her project progress and workload each week; and

(i) Arnold had not by then scheduled additional 1:1 sessions with Schall and Patterson to discuss personal development and progress nor provided an agenda for such meetings as requested.

Dkt. # 46, ¶ 49.

Arnold perceived a change in Schall's demeanor towards her after the PIP was put in place. While prior interactions were light and friendly, Schall seemed to get

increasingly annoyed with Arnold and was constantly "nit-picking" her work.  Schall and Patterson made a few comments to Arnold about her performance on projects in email communications that included other United employees, including how Arnold could have done something differently or improved on her performance.

Arnold states she repeatedly reached out to the higher-ups to complain about the mistreatment she was receiving.  In response to Arnold's email to the Executive Vice President of Human Resources and Labor Relations, Beth Nettles, Director of Employee Relations, informed Arnold that she reviewed the documentation pertaining to Arnold's performance reviews and the PIP and spoke with the appropriate stakeholders about Arnold's concerns.  Nettles stated that she had found no evidence to support Arnold's complaint that her 2019 performance review was unjust or unfair.  Schall did not recall speaking to Nettles, but Tirado remembers speaking to Nettles about her investigation.

United and Arnold disagree about whether Arnold successfully completed her PIP.  United maintains that the PIP was not successfully completed because there were things Arnold completed very late, at the last minute, and other things she did not complete at all.  Arnold denies anything was incomplete.

The meeting during which Schall and Patterson were to give their final feedback to Arnold on the PIP deliverables was supposed to take place on May 8, 2020, but the meeting was rescheduled twice to May 21, 2020.  However, the meeting never took place because on May 20, 2020, Arnold sent an email to Schall and Patterson that stated:

"Team, This will serve as my official notice of my involuntary retirement. My last day will be Tuesday, June 2. I'll be wrapping up all of my work over the next week so let me know who will absorb my work so I may advise my business owners for a seamless transition. Thanks, Mary Ann Arnold." Dkt. # 46, ¶ 54.

Prior to Arnold sending her May 20, 2020 email, no one at United, including Schall, Patterson, or human resources personnel, ever told Arnold that she was discharged or was going to be discharged from United. Arnold, however, believes she was "constructively discharged."

Arnold believes that she was treated more harshly than the Coworker, who demonstrated some of the same performance issues as Arnold, including missing deadlines. Schall testified that she had not put an employee on PIP prior to Arnold. When questioned about the Coworker's performance at her deposition, Schall testified that there may have been times that the Coworker missed deadlines, but the Coworker's handling of it was very different than Arnold's handling of the same issue. Schall testified the Coworker was communicative about adjusting and reestablishing deadlines, something Arnold did not do.

The Coworker received an overall rating of "meets expectations" in her 2019 year-end performance review. Schall noted some issues the Coworker had with her overall attitude and demeanor when she got last minute requests on assignments; however, the Coworker took that feedback and made positive changes. Neither Schall nor Tirado were aware of any complaints made by the Coworker.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). The Court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## DISCUSSION

Arnold brings claims for age discrimination and retaliation under the ADEA and the IHRA, and constructive discharge under Illinois law. In her response to United's motion for summary judgment, Arnold also raises a hostile work environment claim. "The Seventh Circuit applies the same overall analysis to claims under Title VII, the ADEA, and the IHRA." *Gray v. Arrow Elecs., Inc.*, 2019 WL 1399945, at *3 (N.D. Ill.

2019) (citations omitted).  Because the legal standards are the same, if Arnold ultimately fails to prove her ADEA claims, her IHRA claims will necessarily fail as well; if she prevails on her ADEA claims, so too will she prevail on her IHRA theory.  *See Huber v. Fox Valley Park Dist.*, 2021 WL 1546425, at *5 (N.D. Ill. 2021).

## I.    Age Discrimination Claims

"The ADEA protects workers 40 years of age and older from age-based employment discrimination."  *Wrolstad v. Cuna Mut. Ins. Soc'y*, 911 F.3d 450, 454 (7th Cir. 2018).  At summary judgment, we ask whether a reasonable jury could conclude Arnold's age was the cause of the alleged adverse employment actions.  *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764 (7th Cir. 2016).  "'[I]n the ADEA context, it's not enough to show that age was a motivating factor.  The plaintiff must prove that, but for [her] age, the adverse action would not have occurred.'"  *Hoffberg v. Elliot Auto Supply Co., Inc.*, 2024 WL 245186, at *6 (N.D. Ill. 2024) (quoting *Martino v. MCI Commc'ns Serv., Inc.*, 574 F.3d 447, 455 (7th Cir. 2009)).

There are two frameworks a plaintiff can use to show discrimination.  Under the holistic approach established in *Ortiz*, the evidence is viewed in the aggregate to determine whether it allows an inference of prohibited discrimination.  834 F.3d at 765.

Under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), a plaintiff must first establish a prima facie case for discrimination.  This requires a showing that: (1) she was over forty years of age; (2) she was meeting her employer's legitimate expectations; (3) she suffered an adverse

employment action; and (4) similarly situated, substantially younger employees were treated more favorably." *Cabrera v. Advance Pallet, Inc.*, 2023 WL 6276542, at *3 (N.D. Ill. 2023) (citing *Franzoni v. Hartmarx Corp.*, 300 F.3d 767, 771–72 (7th Cir. 2002)). "The law defines substantially younger as 'generally ten years younger.'" *Torbica v. Horizon Bank*, 2023 WL 7214939, at *5 (N.D. Ind. 2023) (quoting *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 322 (7th Cir. 2003)).

Once the plaintiff establishes her prima facia case, the burden then shifts to the employer to present a "legitimate, non-discriminatory reason" for the employment decision. *Bless v. Cook Cnty. Sheriff's Off.*, 9 F.4th 565, 574 (7th Cir. 2021) (quoting *Formella v. Brennan*, 817 F.3d 503, 511 (7th Cir. 2016)). If the employer presents a legitimate reason, the burden shifts back to the employee to show the proffered reason is a pretext for discrimination. *Id.* "The defense bears the burden of articulating the justification, but the plaintiff bears the burden of showing that the justification is a pretext." *Sterlinski v. Catholic Bishop of Chi.*, 934 F.3d 568, 571 (7th Cir. 2019).

The parties agree that, at all relevant times, Arnold, as an individual over the age of 40, was a member of the class sought to be protected by the ADEA. The parties disagree, however, as to whether Arnold (1) suffered an adverse employment action, (2) was meeting legitimate performance expectations, and (3) was treated worse than similarly situated employees.

In support of her age discrimination claim, Arnold argues she suffered two adverse employment actions: being taken off the Core4 project and shifted to projects that had less visibility and interaction with partners, and being placed on the PIP.

At the outset, we conclude that neither of these actions qualify as adverse employment actions.  An adverse employment action must be "one that is materially adverse, meaning more than a mere inconvenience or an alteration of job responsibilities." *Atanus v. Perry*, 520 F.3d 662, 678 (7th Cir. 2008) (quoting *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002)).  The Seventh Circuit has stated time and time again that "not everything that makes an employee unhappy is an actionable adverse action." *Reives v. Ill. State Police*, 29 F.4th 909, 911 (7th Cir. 2022) (quoting *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007)) (cleaned up).

Even if the reassignment of the Core4 project constituted an adverse action, United has offered a legitimate, non-discriminatory reasons the reassignment.  Patterson explained that, as part of the reorganization and for efficiency purposes, a newly-created team was charged with managing projects that spanned across many operations teams (as opposed to just one team).  The Core4 project was largely complete, and Patterson assigned responsibility for any remaining Core4 tasks, along with other operations-wide projects that Arnold was not involved with, to the new team.  Patterson also stated she did not consider the ages of the team members in making decisions regarding the reorganization and reassignment of Core4 tasks.  We agree with United that Arnold

offers no evidence to call into question these facts. She merely cites her own belief that someone younger was assigned the Core4 project—but does not offer any evidence of that individual's age. Arnold also points out that certain unidentified business partners had praised her work and were allegedly confused by her removal from the project. This fact does nothing to undermine or call into question Patterson's explanation for the reassignment.

As for the PIP, "negative performance reviews and performance improvement plans" do not "constitute adverse employment actions." *Fields v. Bd. of Educ. of City of Chi.*, 928 F.3d 622, 626 (7th Cir. 2019) (citations omitted); *see also Swenson v. Bd. of Educ. of City of Chi.*, 2023 WL 4352104, at *4 (N.D. Ill. 2023) ("'[A] negative evaluation or admonishment by an employer does not rise to the level of an adverse employment act.'") (quoting *Lucas v. Chi. Transit Auth.*, 367 F.3d 714, 731 (7th Cir. 2004)); *Saggu v. DeJoy*, 2021 WL 1165106, at *11 (N.D. Ill. 2021) ("Employers are generally free to micro-manage and require as much petty communication as they wish.") (cleaned up); *Fidishin v. Gary Cmty. Sch. Corp.*, 2022 WL 326544, at *10 (N.D. Ind. 2022) (performance critiques, "even if the Plaintiff found them unwarranted," and "getting the cold shoulder from a supervisor" did not impose an objective hardship on the plaintiff and so did not qualify as adverse employment actions).

In any event, if the employer raises the employee's performance as the reason for the adverse employment decision, the Court can skip the prima facie analysis and proceed directly to pretext, because issues of pretext and satisfactory performance

overlap. *Vichio v. United States Foods, Inc.*, 88 F.4th 687, 691 (7th Cir. 2023); *Bragg v. Munster Med. Rsch. Found. Inc.*, 58 F.4th 265, 271 (7th Cir. 2023). "Pretext does not require that plausible facts presented by the defendant not be true, only that they not be the reason for the employment decision." *Hasham v. California State Bd. of Equalization*, 200 F.3d 1035, 1045 (7th Cir. 2000).

The Seventh Circuit has stated "in more than one hundred reported opinions" that a district court is "not a super-personnel department that [can] substitute [its] criteria for an employer's for hiring, promoting, or disciplining employees." *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 933 (7th Cir. 2020) (citations omitted). Rather, in order to determine whether Arnold was meeting United's legitimate expectations, we must look at her job performance through the eyes of her supervisors at the time of the alleged adverse action. *See Harper v. C.R. England, Inc.*, 687 F.3d 297, 310 (7th Cir. 2012). "It is not the court's concern that an employer may be wrong about its employee's performance, or be too hard on its employee." *Ineichen v. Ameritech,* 410 F.3d 956, 961 (7th Cir. 2005) (cleaned up). "'The question is not whether the [employer's performance] ratings were *right* but whether the employer's description of its reasons is *honest.*'" *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 574 (7th Cir. 2021) (quoting *Gustovich v. AT & T Commc'ns, Inc.*, 972 F.2d 845, 848 (7th Cir. 1992)).

Here, Schall testified that Arnold's performance at the end of 2019 was "subpar, at best," and provided a number of examples of performance issues, including missing

deadlines and submitting work last minute, needing multiple reminders to complete tasks, and difficulty adapting to change.

Unfortunately for Arnold, "the fact that [she] disagrees with her supervisor's assessment does not establish pretext." *Abebe v. Health & Hosp. Corp. of Marion Cnty.*, 35 F.4th 601, 607 (7th Cir. 2022); *see also Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d 729, 738 (7th Cir. 2011) (noting that if employee's disagreements with employer's negative assessment of employee's performance "were enough to avoid summary judgment and go to trial on an indirect proof case, summary judgment would become extinct and employer's evaluations would be supplanted by federal juries' evaluations"), *overruled on other grounds by Ortiz*, 834 F.3d 760; *Mirocha v. Palos Cmty. Hosp.*, 240 F. Supp. 3d 822, 839 (N.D. Ill. 2017) (the plaintiff could not create an issue of fact by claiming he was performing adequately or by challenging his supervisors' assessment of his performance). Arnold's belief that she was performing her job adequately "is not relevant to the question of whether [United] believed it had a legitimate, non-discriminatory basis" for the alleged adverse action. *Lauth v. Covance, Inc.*, 863 F.3d 708, 715–16 (7th Cir. 2017); *see also Simpson v. Beaver Dam Cmty. Hosp., Inc.*, 780 F.3d 784, 795 (7th Cir. 2015) ("The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reasons it has offered to explain its decision.") (cleaned up).

And, the fact that Arnold had never received less than "achieves" on past evaluations under different supervisors does not factor into the analysis. *See Peele v.*

*Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002) ("[T]he issue is not the employee's past performance but 'whether the employee was performing well at the time of [her] termination.'" (second alteration in original) (quoting *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 336 (7th Cir. 1991))); *see also Zayas v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1158 (7th Cir. 2014) ("The question is not whether she *ever* satisfied the Hospital's expectations, but whether she met the Hospital's expectations *at the time she was fired*."); *Truesdale v. Maine Twp. High Sch. Dist. No. 207*, 2006 WL 2375469, at *9 (N.D. Ill. 2006) (employer's expectations must be considered at the time of the adverse action because the "quality of an employee's performance may change over time" and "the people who evaluate that performance may change as well").

At bottom, the only evidence Arnold provides for pretext is her belief that the actions taken against her were due to her age.  *See Lauth.*, 863 F.3d at 716 ("[Plaintiff] has failed to point to any evidence, other than his belief that [his employer's] assessments of his workplace behavior were mistaken, from which a jury could infer that [his employer] terminated him because of his age.  Therefore, his age discrimination claim fails.").

Finally, even viewing the evidence in Arnold's favor, no reasonable jury could conclude that age discrimination was the "but-for" cause of the alleged adverse actions. "At the end of the day, the question is simply whether the same events would have transpired if [Arnold] had been younger than 40 and everything else had been the same."

*Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 725 (7th Cir. 2018) (cleaned up).  Based on the undisputed facts, the answer is yes.

Viewing the evidence holistically, a reasonable factfinder could not conclude Arnold's age caused the adverse employment actions at issue here (to the extent they can even be counted as adverse).  *See id.*  In sum, Arnold "has failed to marshal evidence in the record indicating, even when viewed in [her] favor, a genuine dispute of material fact as to whether [she] was discriminated against in violation of the ADEA."  *Murphy v. Caterpillar, Inc.*, 2024 WL 520020, at *15 (C.D. Ill. 2024).  United is entitled to summary judgment on Arnold's age discrimination claims.

## II.    Retaliation Claims

To survive summary judgment on her retaliation claims, Arnold must offer evidence of: "(1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two."  *Skiba*, 884 F.3d at 718.  "For purposes of retaliation, an adverse employment action is one that well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Abebe*, 35 F.4th at 607 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)) (cleaned up).

Arnold claims she engaged in "several instances" of protected activity: (1) when she complained in 2017 about age and disability discrimination; (2) when she reported Jones for sexual harassment in 2018; (3) when she made internal complaints about having the Core4 project taken away and given to a younger employee; (4) when

she complained about having to sit near Jones in 2019; (5) when she complained about the way she was treated during her 2019 year-end review; and (6) when she complained about the PIP process.

First of all, for a complaint to qualify as "statutorily protected activity," it "must be about the [challenged] discrimination." *McHale v. McDonough*, 41 F.4th 866, 871 (7th Cir. 2022).  "In order for [Arnold's] complaints to constitute protected activity, they must include an objection to discrimination on the basis of age." *Smith v. Lafayette Bank & Tr. Co.*, 674 F.3d 655, 658 (7th Cir. 2012) (citing 29 U.S.C. § 623); *see also Lauth.*, 863 F.3d at 717; *Howard v. Indianapolis Pub. Schs.*, 727 F. App'x 198, 202 (7th Cir. 2018) ("[T]he judge correctly explained that a report of misconduct . . . must concern . . . age discrimination to be protected activity under the ADEA.").  While "an employee need not use . . . magic words," like "age," *see Sitar v. Indiana Dep't of Transp.*, 344 F.3d 720, 727 (7th Cir. 2003), "[m]erely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006).  As such, Arnold's complaints about Jones cannot support her retaliation claims.

While Arnold's 2017 complaint about age discrimination counts as a protected activity, no reasonable juror could conclude a causal connection exists between that complaint and any of the adverse actions.  At a minimum, the events are simply far too attenuated to permit an inference of a retaliatory motive.  An inference of retaliation

"can be weakened by 'a lengthy time period between the protected activity and the alleged retaliation.'" *Alamo v. Bliss*, 864 F.3d 541, 556 (7th Cir. 2017) (quoting *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 828 (7th Cir. 2014)); *see also Lalvani v. Cook Cnty., Ill.*, 269 F.3d 785, 790 (7th Cir. 2001) ("As the time separating the protected conduct and the adverse employment action grows, the causal inference weakens and eventually time becomes the plaintiff's enemy.").

It is unclear from the record whether Arnold complained of age discrimination in connection with her complaints about her year-end review and the PIP process. To the extent that her complaints about her negative performance reviews and the PIP constituted protected activity, "[p]erformance improvement plans, particularly minimally onerous ones . . . are not, without more, adverse employment actions." *Davis v. Time Warner Cable of Se. Wis., L.P.*, 651 F.3d 664, 677 (7th Cir. 2011); *see also Langenbach v. Wal-Mart Stores, Inc.*, 761 F.3d 792, 799 (7th Cir. 2014) (negative performance reviews and PIPs are not adverse employment actions); *Cole v. Illinois*, 562 F.3d 812, 816–17 (7th Cir. 2009) (placing the plaintiff on "employee improvement plan" that required him to submit daily and weekly schedules to supervisors not materially adverse action).

Additionally, Arnold has not come forth with evidence from which a factfinder could infer causation or retaliatory intent. In the retaliation context, an employee can establish causation with circumstantial evidence, such as "suspicious timing, a pretextual explanation for the termination [or adverse action], and evidence that

similarly situated employees were treated differently." *Abrego v. Wilkie*, 907 F.3d 1004, 1015 (7th Cir. 2018). As we noted above, Arnold has not demonstrated pretext. And suspicious timing alone is not enough to survive summary judgment. *See id*. (citing *Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 675 (7th Cir. 2011)); *Boss v. Castro*, 816 F.3d 910, 918 (7th Cir. 2016) ("A causal link requires more than the mere fact that an employer's action happens after an employee's protected activity."). Nor is Arnold's own belief or speculation that an action was retaliatory. *See*, *e.g.*, *Formella*, 817 F.3d at 516; *Brown v. Advocate S. Suburban. Hosp.*, 700 F.3d 1101, 1108 (7th Cir. 2012) ("[Plaintiff] must produce evidence that a retaliatory motive *actually* influenced the decision-maker, not merely that it *could* have."). To the extent that the Coworker can be considered a similarly situated employee, United has offered legitimate reasons why the Coworker was not put on a PIP despite having some similar performance issues. Schall testified that there may have been times that the Coworker missed deadlines, but the Coworker's handling of it was very different than Arnold's handling of the same issue, and that the Coworker was communicative about adjusting and reestablishing deadlines, something Arnold did not do.

For all of these reasons, United is entitled to summary judgment on Arnold's retaliation claims.

## III.    Hostile Work Environment Claim

Next, United argues it is entitled to summary judgment on Arnold's hostile work environment claim. We agree. Because the Seventh Circuit uses Title VII's framework

for analyzing hostile work environment claims brought under the ADEA, the Court does so here as well.  *See Tyburski v. City of Chicago*, 964 F.3d 590, 600 (7th Cir. 2020).

An employer creates a hostile work environment when "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014).  To prevail on such a claim, "a plaintiff must show: (1) the work environment was both subjectively and objectively offensive; (2) the harassment was based on membership in a protected class; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability."  *Trahanas v. Northwestern Univ.*, 64 F.4th 842, 853 (7th Cir. 2023).  Several considerations play into whether an environment is hostile: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Casino Queen*, 739 F.3d at 982 (quoting *Mendenhall v. Mueller Streamline Co.*, 419 F.3d 686, 691–92 (7th Cir. 2005)).  What matters is whether the conduct became so severe or pervasive that "a reasonable person would find [it] hostile or abusive."  *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993).

Arnold's allegations are merely "a series of minor or trivial employment actions" that, even considered in combination, do not rise to the level of an abusive work

environment.  Importantly, Arnold has failed to show that any of the alleged harassing incidents were based on her age or her age-based protected activities.  And no reasonable juror could conclude that Arnold was subjected to a working environment "permeated with discriminatory intimidation, ridicule, and insult" to support a hostile working environment claim.  *See*, *e.g.*, *Hambrick v. Kijakazi*, 79 F.4th 835, 843 (7th Cir. 2023) ("heavy workload, management's high expectations, and routine workplace discipline" is not enough); *Duniya v. Power*, 2023 WL 2755132, at *4 (N.D. Ill. 2023) (complaints of "being assigned additional duties, having a temporary assignment cancelled, having other duties taken away from him, being verbally admonished during a meeting, receiving poor marks on his evaluation, having overtime payment requests denied, being bullied, and receiving a suspension" are "general workplace complaints [that] do not allow the Court to infer that a reasonable person would find his work environment hostile and instead appear to merely reflect Duniya's displeasure with his supervisors' management of his work."); *Dodgen v. AARP*, 2022 WL 4607926, at *4 (N.D. Ill. 2022).  United is entitled to summary judgment on Arnold's hostile work environment claim.

## IV.    Constructive Discharge Claim

Finally, Arnold brings a claim for constructive discharge.  As an initial matter, Arnold fails to respond to United's argument that the claim is unexhausted, thereby waiving any argument against it.  "[D]istrict courts have routinely found constructive discharge claims unexhausted if the EEOC charge was filed prior to the plaintiff's

resignation and the plaintiff did not amend her charge or otherwise bring the resignation to the EEOC's attention during the investigation process." *Shuler v. McCarthy*, 2019 WL 13171974, at *3 (C.D. Ill. 2019) (collecting cases). As United correctly notes, Arnold filed her discrimination charge with the IDHR on March 2, 2020, long before she sent her May 20, 2020 retirement email, and Arnold never filed a subsequent or amended charge. The Court therefore finds Arnold failed to exhaust this claim; it is dismissed without prejudice. *See McHale v. McDonough*, 41 F.4th 866, 872 (7th Cir. 2022) ("When a plaintiff fails to exhaust administrative remedies, her complaint must be dismissed without prejudice. And when a district court grants summary judgment in that situation instead of dismissing without prejudice, we have remanded so that it may correct its mistake.") (internal citation omitted); *Teal v. Potter*, 559 F.3d 687, 693 (7th Cir. 2009).

Even if it had been exhausted, Arnold's claim of constructive discharge would not survive summary judgment. "A plaintiff asserting that she resigned (here, forcibly retired) due to alleged *discriminatory* harassment must 'show working conditions even more egregious than that required for a hostile work environment claim.'" *Gordon v. DeJoy*, 2023 WL 4762595, at *4 (N.D. Ill. 2023) (quoting *Brooks v. City of Pekin*, 2023 WL 3355320, at *16 (C.D. Ill. 2023)) (emphasis added). Arnold does not point to evidence from which a reasonable jury could find the existence of such treatment.

Arnold's argument that her constructive discharge claim could still survive summary judgment because "courts have stated that '[w]hen an employer acts in a

manner so as to have communicated to a reasonable employee that she will be terminated, and the plaintiff employee resigns, the employer's conduct may amount to constructive discharge,'" is unpersuasive.  Dkt. # 45, at 15 (quoting *EEOC v. Univ. of Chi. Hosps.*, 276 F.3d 326, 332 (7th Cir. 2002)).  Arnold might be correct on the law, but the evidence does not support this theory.

Under this theory of constructive discharge, Arnold must show that she was forced to resign because her "working conditions [became] so intolerable that a reasonable person would have felt compelled to resign."  *Stamey v. Forest River, Inc.*, 37 F.4th 1220, 1225 (7th Cir. 2022) (citation omitted).  "In other words, constructive discharge occurs where, based on an employer's actions, the handwriting was on the wall and the axe was about to fall." *Scaife v. U.S. Dep't of Veterans Affs.*, 49 F.4th 1109, 1119 (7th Cir. 2022) (cleaned up); *see also Hunt v. City of Markham*, 219 F.3d 649, 655 (7th Cir. 2000) ("A person who is told repeatedly that he is not wanted, has no future, and can't count on ever getting another raise would not be acting unreasonably if he decided that to remain with his employer would necessarily be inconsistent with even a minimal sense of self-respect, and therefore intolerable.").  However, a "working condition does not become intolerable or unbearable merely because a prospect of discharge lurks in the background."  *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010) (cleaned up).

Arnold says she was continually reminded her job was on the line based on the PIP policy, she was told by Michelson when attempting to resolve the seating issue that

she would need to decide if she wanted to continue working for United long-term, and Schall repeatedly told Arnold she was not meeting the expectations of the PIP.  These things are a far cry from what was found sufficient in *University of Chicago Hospitals*, which is the only case Arnold cites in support of this argument.  There, the plaintiff returned to work to find her belongings packed and her office converted to storage.  276 F.3d at 331.

Arnold invites the Court to speculate that she would have been discharged at her final PIP meeting.  "We are particularly loath to engage in such guesswork in the constructive discharge context, where we recognize that the burden remains on the employee to show why [she] would have had to quit immediately."  *Ziccarelli v. Dart*, 35 F.4th 1079, 1092 (7th Cir. 2022) (citing *Chapin*, 621 F.3d at 680) (cleaned up).  To the extent her constructive discharge claim was exhausted, summary judgment would be warranted.

### CONCLUSION

For the foregoing reasons, United's Motion for Summary Judgment [42] is granted. Judgment is entered in favor of United on Arnold's ADEA and IHRA discrimination and retaliation claims, and her hostile work environment claim. Arnold's constructive discharge claim is dismissed without prejudice as unexhausted. Civil case terminated.

It is so ordered.

_____
Charles P. Kocoras
United States District Judge

Date: June 11, 2024

**STATE OF ILLINOIS**
**DEPARTMENT OF HUMAN RIGHTS**

IN THE MATTER OF:

MARY ANN ARNOLD,                    )
                                    )
                                    )
                    COMPLAINANT,    )   CHARGE NO.    2020CA1821
AND                                 )   EEOC NO.      21BA00933
                                    )
UNITED AIRLINES, INC.,              )
                                    )
                                    )
                                    )
                                    )
                    RESPONDENT.     )

**NOTICE OF DISMISSAL**
**FOR LACK OF SUBSTANTIAL EVIDENCE**

For Complainant

Mary Arnold
5531 W Edmunds St
Apt GE
Chicago IL  60630

For Respondent

Megan Detzner
United Airlines
Support Center
233 S Wacker Dr
11th Fl
Chicago IL  60606

DATE OF DISMISSAL: March 19, 2021

1.  YOU ARE HEREBY NOTIFIED that based upon the enclosed investigation report,
    the Department has determined that there is NOT substantial evidence to support
    the allegation(s) of the charge. Accordingly, pursuant to Section 7A-102(D) of the
    Act (775 ILCS 5/1-101 et seq.) and the Department's Rules and Regulations (56
    Ill. Adm. Code. Chapter II, §2520.560) the charge is HEREBY DISMISSED.

2.  If Complainant disagrees with this action, Complainant may:

    a)  Seek review of this dismissal before the Illinois Human Rights Commission
        (Commission), 100 West Randolph Street, Suite 5-100, Chicago, Illinois,
        60601, by filing a "Request for Review" with the Commission by the request for
        review filing date below.  Respondent will be notified by the Commission if a
        Request for Review is filed.

**REQUEST FOR REVIEW FILING DEADLINE DATE:**  June 22, 2021

        Or, Complainant may:

    b)  Commence a civil action in the appropriate state circuit court within ninety (90)
        days after receipt of this Notice.  A complaint should be filed in the Circuit
        court in the county where the civil rights violation was allegedly committed.

- (Complainant) does not consistently demonstrate the ability to define expectations (deadlines, in particular) and see those are met without much hardship. It seems difficult for (Complainant) to intake a project/change and clearly convey such a change to a broader group. Instances include: petsafe changes and proactive compensation changes, which have become problematic more broadly.

- Straightforward requests (like and editorial calendar / InTheNoc) often require numerous follow-ups, over several months before work is executed.

- Despite deadlines with long runways and regular check-ins on progress to ensure (Complainant) is managing her assignments, her work regularly comes together at the last minute. Even when final deadlines are met, this delayed output impacts (or is a burden to) her manager and peers during the review process.

- As noted in her mid-year review, (Complainant) has a passion for making sure the frontline gets what they need to perform their jobs effectively. However, she needs to be proactive in identifying and solving problems, so business partners can achieve their goals. This continues to be an area of development for 2020.

- (Complainant) is proactive in asking a lot of questions for clarification, but they can be repetitive and oftentimes have been previously answered.

- Like CSD Comm (GOSPD), Corp Comm is a shared service to the business. The work we are asked to support and the role we play is constantly changing. It is a fast-paced, agile environment. The ability to pivot and move forward is critical to frontline success. Creating structure and understanding in the face of ambiguity is essential even when there's not substantial definition or guidance. Overall, during the Corp Comm re-organization, (Complainant's) ability to adjust, understand expectations and add value, was well behind her peers.

6. Complainant stated that there are 4 levels of discipline that should happen before a Performance Improvement Plan, which did not happen with her.

7. Complainant stated that the performance improvement plan was designed to terminate her. Complainant stated that she completed all the task on the performance improvement plan and was still told that she still does not meet expectations.

8. Complainant stated that she ultimately retired.

Charge No.: 2020CA182
Page 27 of 33

9. Complainant stated that she feels that this happened because of her age because the restructure seemed to target older employees.

10. Complainant stated that she feels this was in retaliation for her complaints because she has been complaining. Complainant stated that she has never had any coaching or performance issues prior to her complaints.

B. **Respondent's Evidence:**

1. Detzner stated that Complainant participated in a protected activity on August 10, 2017, and September 26, 2018, when she filed and internal complaint of age discrimination and sexual harassment, respectively.

2. See Investigation Summary – Counts A – F: Respondent's Evidence.

3. Detzner stated that Respondent's Performance management process; Performance Improvement Plan **(Exhibit T)** indicates the following:

> Sometimes there is a difference between what is expected of you and how you perform. Perhaps your manager has informed you at either the mid-year check-in or year-end rating and review that you aren't meeting performance expectations. In that case, your manager may work with you to develop a formal plan that maps out a path to successful performance. We refer to this plan as Performance Improvement Plan (PIP).

> You'll be expected to meet the requirements outlined in the PIP within a specified time frame. Consider what you can do to meet the requirements. What steps can you take to improve your performance? At this point, if you don't meet the requirements of the PIP you could be terminated from your job. This could also happen if you partially meet performance expectations at year-end for two years in a row, or at your leader's discretion.

4. Patterson stated that on February 21, 2020, Complainant received a 60-day Performance Improvement Plan which clearly outlined her responsibilities to help improve her performance and align with expectations.

5. Detzner stated that Respondent's copy of Complainant's Performance Improvement Plan **(Exhibit U)** indicates the following:

> • (Complainant) does not consistently demonstrate the ability to define expectations (deadlines, in particular) and see those are met without much hardship. It seems difficult for (Complainant) to intake a project/change and clearly convey such a change to a broader group. Instances include: petsafe changes and proactive compensation changes, which have become problematic more broadly.

Charge No.:  2020CA182
Page 31 of 33

(872)825-7608

C.  Preet Michelson (50, no PA)                    FFC
    Managing Director of Corporate Human Resources
    C/o Megan Detzner, Director of EEO Compliance
    United Airlines Corporate Support Center
    233 S. Wacker Dr., 11th Floor
    Chicago, IL 60606
    (872)825-7608

D.  Courtney Schall (40, no PA)            Telephone interview, 2/3/21
    Former Senior Manager of Operations Communications
    C/o Megan Detzner, Director of EEO Compliance
    United Airlines Corporate Support Center
    233 S. Wacker Dr., 11th Floor
    Chicago, IL 60606
    (872)825-7608

E.  Megan Detzner (49, no PA)                      FFC
    Director of EEO Compliance
    United Airlines Corporate Support Center
    233 S. Wacker Dr., 11th Floor
    Chicago, IL 60606
    (872)825-7608

**Staff Note:**

In her Complainant questionnaire submitted to the Department, Complainant listed Eddy Ryan as a witness to her charge.  Complainant indicated that Ryan had knowledge regarding her 2017 complaint.  Since Complainant's 2017 complaint is not at issue in the charge, staff declined to interview Ryan.

In her Complainant questionnaire submitted to the Department, Complainant listed Michael Ciezadlo as a witness to her charge.  Complainant indicated that Ciezadlo had knowledge regarding her 2017 complaint.  Since Complainant's 2017 complaint is not at issue in the charge, staff declined to interview Ciezadlo.

In her Complainant questionnaire submitted to the Department, Complainant listed Jacqui Key as a witness to her charge.  Complainant indicated that Key was told by Complainant about the issues she was experiencing.  Since Key does not have first-hand knowledge regarding the issues in the charge, staff declined to interview Key.

In her Complainant questionnaire submitted to the Department, Complainant listed Holly Lehmann as a witness to her charge.  Complainant indicated that Lehmann had knowledge regarding her 2017 and 2018 complaints and was told by Complainant about other issues she was experiencing.  Since Complainant's 2017 or 2018 complaints are not at issue in

I've involuntarily retired as of 6/3 with no severance. I've claimed "involuntary retirement" as I had been constantly harassed and experienced retaliatory actions after opposing discrimination, harassment and retaliation after filing internal complaints.  In addition to no severance, I've applied for unemployment (in adjudication) and am also paying nearly $800 a month for COBRA insurance.

These extensive and thorough statements on the following pages since 2017 will tell the story of my workplace experiences. I was being threatened with termination and subsequently losing tenured benefits from my 26 year career including but not limited to lifetime accrued/awarded flight benefits and pension. I was not given a repeatedly requested copy of my employment file. I was also NOT asked to return my work phone, laptop, and monitor or give an exit interview all of which is standard for someone leaving the company. There was a notification in my employee profile stating "Litigation Hold." My attorney(s) advised to let them fire me as a result of their claim that I hadn't completed the vague and large volume of work on an aggressive, level skipping performance improvement plan (PIP). I chose to quit/resign/retire due the on-going trauma cited in my psychologist's and therapists notations, I would have likely suffered an emotional breakdown. It's important to note that I've maintained record retention, documented conversations and saved relevant emails since 2017 and not merely since the discrimination and performance disciplinary actions taken against me in February 2020. Feel free to contact me for further questions. I was advised that an investigater has not yet been assigned to my complaint.

## COMPLAINANT QUESTIONNAIRE

Charge number: **2020CA1821**
Complainant: **Mary A. Arnold**
Respondent: **UNITED AIRLINES**


1.  Respondent information:
    a.  Mary Ann Arnold
    b.  5531 W. Edmunds St. #GE Chicago, IL 60630
    c.  I'm currently a **Sr. Writer Operations Communications, Corporate Communications** for United Airlines at the Corporate Support Center (Headquarters) at Willis Tower 233. S. Wacker Dr. Chicago, IL 60606
    d.  I create, edit and publish policy, procedures and project strategy communications so our employees can serve our customers.
2.  I started with Continental Airlines on March 14, 1994 – which later merged with United Airlines in 2010. I had 17 years with Continental and now I have 26 years and 2 months with combined – United Airlines.

Dept. of Human Rights
CDU

JUL 1 5 2020

By: _____ RECEIVED

around an impending firing, I quit/retired and informed HR and leadership I was "involuntarily retiring. " I felt I had no choice. There will be additional cuts through September due COVID impact on the airline industry. Had I survived being fired, I would have definitely been furloughed/fired with the performance review, rating and PIP. I haven't signed anything, have my full rights and will NOT BE SILENCED.

I'd tried and was interviewed once for a position to get off the team but the job was pulled in early March with the COVID-19 pandemic and financial impact on 90% reduction in United flying. I also was considering transferring back into the front line operation at O'Hare as a Customer Service Supervisor, they had openings and I'd have been accepted but this was also pulled due COVID impact. I felt trapped on a team where I was treated very badly and forced out.

**ZZ4. Why do I believe my participation in a protected activity was a factor in the way I was treated? Explain.**

As previously stated, and although United has corporate polices around reporting discrimination, retaliation, harassment and sexual harassment, the fact is that the corporate culture doesn't actually support that. I've acted in line with my core values in speaking up for myself. Ironically I've had good performance, generous pay increases and a highly reputable long career. I've had over 10 positions/roles across various locations. It is only after being at the corporate headquarters since 2015, and experiencing first an illness and missing 6 weeks of work and then some discrimination from a new leader (Danyale Hawkins) and then an incident of sexual harassment on a business trip from my then leader, Stephen Jones that my career advancement, performance and reporting and escalating these issues that I began to have issues with leaders and ultimately ended my career.

After the first claim of discrimination against Danyale Hawkins August, 2017, I was successful in surviving her attempt to displace/furlough/terminate me and got a promotion, move package and almost 13% raise. After the internal claim ran its course, it was determined that Danyale **HAD in fact retaliated against me**. According to the Ethics/HR team she should have not told me she would not consider me for one of her positions on her new team. Danyale was found liable for this and was managed out and "reduction in force" in June 2018.

They brought in Stephanie Millichap to replace her. It is my feeling that incident of retaliation and Danyale being terminated, put me on a corporate HR "hit list" and that's why I was never allowed to promote or move to another team. It is my feeling that there was an HR block put on me to restrict that. Then when the sexual harassment claim occurred, they set out on a campaign to terminate me. The only way to do so is to call my performance into question. This is why there was no coaching, counseling, specific feedback or clearly communicated expectations around the issues on the performance